**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RESTAURANT TECHNOLOGIES, INC.,  :
                                :    CIVIL ACTION NO. 05-5356 (MLC)
        Plaintiff,              :
                                :    **MEMORANDUM OPINION & ORDER**
        v.                      :
                                :
JERSEY SHORE CHICKEN,           :
                                :
        Defendant.              :
_____ :
                                :
RESTAURANT TECHNOLOGIES, INC.,  :
                                :
        Plaintiff,              :
                                :
        v.                      :
                                :
KLEE's BAR & GRILL,             :
                                :
        Defendant.              :
_____ :
                                :
OILMATIC SYSTEMS, LLC,          :
                                :
        Plaintiff,              :
                                :
        v.                      :
                                :
RESTAURANT TECHNOLOGIES, INC.,  :
                                :
        Defendant.              :
_____ :

**COOPER, District Judge**

Restaurant Technologies, Inc. ("RTI") commenced separate actions against Jersey Shore Chicken ("Jersey Shore") and Klee's Bar & Grill ("Klee's") alleging, inter alia, that they are infringing one or more claims of its United States Patent No. 5,249,511 (the "'511 patent") either literally or under the

doctrine of equivalents.  (Dkt. entry no. 1, Compl., at ¶ 10;
Civil Action No. 05-5358 (MLC), dkt. entry no. 1, Compl., at ¶
10.)  RTI requests, inter alia, (1) that Jersey Shore and Klee's
"be enjoined preliminarily and permanently from infringing the
'511 patent", and (2) an award of trebled damages.  (Dkt. entry
no. 1, Compl., at ¶¶ a-c; Civil Action No. 05-5358 (MLC), dkt.
entry no. 1, Compl., at ¶¶ a-c.)

        Oilmatic Systems, LLC ("Oilmatic" and collectively with
Jersey Shore and Klee's, "Defendants") commenced an action
against RTI "for tortious interference, unfair competition,
antitrust, and declaratory judgment arising from RTI's baseless
suits and threats against customers of Oilmatic."  (Civil Action
No. 06-0363 (MLC), dkt. entry no. 1, Compl., at 1.)
Specifically, Oilmatic alleges that beginning in August 2005,
"RTI and its representatives and agents began a campaign of
threatening customers of the patented Oilmatic [bulk cooking oil
supply and management] system with allegations of infringement of
the '511 Patent, even though the claims were baseless and
unwarranted."  (Id. at ¶ 22.)  Oilmatic seeks an order and
judgment, inter alia, (1) declaring that neither it nor its
customers, including Jersey Shore and Klee's, is infringing the
'511 patent, (2) preliminarily and permanently enjoining RTI from
asserting any patent infringement claims against Oilmatic or its
customers in connection with the '511 patent, (3) declaring that

                                    2

the '511 patent is invalid, (4) awarding Oilmatic damages, and
(5) directing RTI to pay to Oilmatic all profits derived from
RTI's wrongful conduct.  (Id. at ¶¶ A-K.)

Oilmatic's action against RTI and RTI's actions against
Klee's and Jersey Shore were consolidated under Civil Action No.
05-5356 (MLC).  (Dkt. entry no. 11, Pretrial Sch. Ord., at ¶ 1.)
Thereafter, RTI filed a counterclaim against Oilmatic alleging,
inter alia, that Oilmatic is infringing one or more claims of the
'511 patent either literally or under the doctrine of
equivalents.  (Dkt. entry no. 13, RTI's Ans. & Counterclaim, at
9.)  Thus, RTI requests, inter alia, (1) that Oilmatic "be
enjoined preliminary and permanently from infringing the '511
patent", and (2) an award RTI of trebled damages.  (Id. at 10, ¶¶
a-c.)

The parties dispute the proper construction of claims 1-6,
8, and 11 of the '511 patent.  The Court has (1) considered the
papers submitted by the parties, and (2) heard oral argument on
December 6, 2006, and thereby conducted its Markman hearing.  See
Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir.
1995), aff'd, 517 U.S. 370 (1996).  Accordingly, the Court hereby
issues the following findings of fact and conclusions of law with
respect to its construction of the '511 patent's claims.

## BACKGROUND AND FACTUAL FINDINGS

### I.   The Parties

RTI is a Delaware corporation with its principal place of business in Minnesota.  (Dkt. entry no. 1, Compl., at ¶ 1.)  RTI owns all right, title, and interest to the '511 patent.  Jersey Shore is a New Jersey corporation with its principal place of business in New Jersey.  (Dkt. entry no. 4, Jersey Shore's Ans. & Counterclaim, at 1.)  Klee's is also a New Jersey corporation with its principal place of business in New Jersey.  (Civil Action No. 05-5358 (MLC), dkt. entry no. 4, Klee's Ans. & Counterclaim, at 1.)  Finally, Oilmatic is a New Jersey corporation with its principal place of business in New Jersey. (Civil Action No. 06-0363 (MLC), dkt. entry no. 1, Compl., at 1.) Oilmatic manufactures a patented bulk cooking oil supply and management system (the "Oilmatic System"), which it asserts is "highly regarded in the industry because it is more universal yet more simple than competing systems."  (Id. at ¶ 12.)

### II.  RTI's '511 Patent

The '511 patent "describes a bulk cooking oil distribution and waste removal system that provides for easy, safe, and efficient handling of fresh and waste cooking oil used in a restaurant kitchen's fryer."  (RTI Br., at 1.)  The system has filter, waste, supply, and fryer stations connected by piping that enables oil to move along preselected pipe paths.  (Dkt.

entry no. 1, Ex. A, '511 patent, at Abstract.)  The '511 patent's specification, which is entitled "Detailed Description of the Preferred Embodiment of the Present Invention", states that the filter station is comprised of a filter and a pair of independently operated filter valves, which may be operated manually or electronically and are positioned respectively in the pipe lines leading to the entrance and exit sides of the filter. (Id. at col. 4, lines 51-58.)  The waste station is comprised of a waste receptacle and a pair of independently operated entrance and exit waste valves, which may be operated manually or electronically and are positioned in the pipe line leading to the receptacle.  (Id. at col. 4, lines 63-68.)  Moreover, the supply station is comprised of a supply storage tank and a pair of independently operated entrance and exit supply valves, which are positioned in the pipe line leading to the tank.  (Id. at col. 5, lines 4-7.)  The fryer station is comprised of a pair of valves, which are positioned in pipe lines intersecting with a coupling that is attached to one end of a flexible line.  (Id. at col. 5, lines 17-19.)  The other end of the flexible line contains a squeezable nozzle valve that is adapted to be inserted in a fryer vat.  (Id. at col. 5, lines 19-21.)  A pump delivers cooking oil along whatever path is designated by the opening and closing of the various valves.  (Id. at col. 5, lines 10-12.)

The specification explains:

> Basically, the system is designed to operate in close
> synchronization with the needs of the user of kitchen
> cooking equipment.  These needs vary from the
> introduction of fresh cooking oil into the system and
> metering of the oil into the frying vat, to the
> recycling/filtering of used cooking oil, and finally,
> to the complete removal of waste oil from the system.

(Id. at col. 5, lines 34-40.)  The specification then describes 7

cycles that the system is capable of performing in order to meet

these needs.  (Id. at col. 1, line 40 through col. 6, line 60.)

However, the specification notes:

> It is clear that those skilled in the art will be able
> to modify the embodiments of the present invention. . .
> . For example, other and different valve arrangements
> may be employed.  The various operation cycles and
> manually operated valves may be completely or partially
> automated, using microprocessor based controls.
> Automated timing sequences may be incorporated into the
> system or apparatus.

(Id. at col. 10, lines 42-50.)

The '551 patent contains 15 claims, but only claims 1-6, 8,

and 11 are at issue here.  (RTI Br., at 1.)  Of those claims,

only claims 1 and 8 are independent; claims 2-6 ultimately depend

upon claim 1 and claim 11 depends upon claim 8.  Claims 1 through

6 provide:

> 1.  A bulk cooking oil system having various stations
> connected by piping for movement of oil along
> preselected pipe paths comprising:
>     (a)  a filter station including
>         (i)  means for filtering cooking oil from
>             said fryer station and
>         (ii) filter valve means for opening and
>             closing pipe lines leading to and away
>             from said filter station;

6

    (b)  a waste station including
        (i)   means for storing used oil and
        (ii)  waste valve means for opening and
              closing a pipe line leading to and away
              from said waste station;
    (c)  a supply station including
        (i)   means for storing oil to be used at said
              fryer station for cooking food products
              and
        (ii)  supply valve means for opening and
              closing a pipe line leading to and away
              from said supply station;
    (d)  a fryer station including
        (i)   a fryer for receiving and heating
              cooking oil to cook food products,
        (ii)  fryer valve means for opening and
              closing a pipe line leading to and from
              said fryer station, and
        (iii)means for metering oil to said fryer in
              predetermined amounts;
    (e)  control means for selectively operating said
        filtering, waste[,] supply and fryer valve
        means and for selecting a pipe path between a
        predetermined pair of said stations;
    (f)  pump means for moving oil along said selected
        pipe path.
2.   The system of claim 1 wherein said filter valve in response to said control means is in an open state in which the pipe line leading to and away from said filter station is open and wherein said waste valve mean [sic], said supply valve means, and said fryer valve means in response to said control means are all in closed states in which the respective pipe lines leading to and away from said waste station, supply station and said fryer station are closed thereby forming a looped pipe path between said filter station and said pump.[1]
3.   The system of claim 2 in which said filter valve means is a pair of valves.
4.   The system of claim 3 in which said filter station includes a removable filter for removing large carbon particles in the cooking oil when circulated there-through.

---

[1] We believe claim 2 contains a clerical error. Specifically, we believe claim 2 should begin by stating, "[t]he system of claim 1 wherein said filter valve _means_ in response to said control means is in an open state. . . ."

    5.   The system of claim 2 wherein said filter valve
means and said fryer valve means in response to said
control means open pipe lines forming a pipe path from
said fryer station to said filter station whereby oil
is moved along the path by said pump means.
    6.   The system of claim 1 in which said pump means is
a single pump for moving the oil.

(Dkt. entry no. 1, Ex. A, '511 patent, at col. 10, lines 55-68 &

col. 11, lines 1-44.)

    Claims 8 and 11 provide:

    8.   Apparatus for the distribution and recycling of
cooking oil comprising:
        (a)   a first container for receiving and storing
            cooking oil;
        (b)   a second container adapted to receive and
            store waste cooking oil;
        (c)   a filter unit for housing a filter used to
            filter particles in used cooking oil;
        (d)   first and second coupling attachments adapted
            respectively to be coupled to lines leading
            to a fryer and to egress from said apparatus;
        (e)   piping network interconnecting said first and
            second containers, said filter unit and said
            first and second couplings;
        (f)   pipe path control means for determining a
            pipe path within said piping between a pair
            selected from among said first and second
            containers, said filter unit and said first
            and second coupling attachments; and
        (g)   pump means for circulating cooking oil along
            said selected path.
. . .
    11.  The apparatus of claim 8 in which said filter is
removable from said filter unit.

(Id. at col. 11, lines 49-52 & col. 12, lines 1-17, 29-30.)

Thus, the bulk cooking oil and waste removal system described in

the '511 patent permits a person standing at the fryer to obtain

fresh cooking oil from a remote storage tank, remove used oil

from the fryer, filter used oil and return it to the fryer, and

permanently remove waste oil from the fryer and transport it to a
remote storage tank.  (RTI Br., at 2.)

## III. **The Oilmatic System**

Oilmatic owns United States Patent Number 6,792,983, which
describes its Oilmatic System.  (Defs. Br., at 1.)  The Oilmatic
System "generally comprises a fresh oil tank, a waste oil tank,
and piping from each tank connected along parallel paths to
pumps, the piping then leading to a Dipstick nozzle that may be
dipped into a fryer vat in order to fill or remove cooking oil
through either of the independent pipe paths."  (Civil Action No.
06-0363 (MLC), dkt. entry no. 1, Compl., at ¶ 13.)  The Dipstick
nozzle remains separate and apart from the fryer vat when it is
not in use.  (Id.)  The Dipstick nozzle holds together a supply
nozzle and a waste pipe nozzle in one housing unit.  (Defs. Br.,
at 9.)  When an operator wants to fill the fryer, a fresh oil
pump located in the supply pipe is activated and fresh cooking
oil is delivered from the fresh oil supply tank into the fryer
vat.  (Id.)  Further, when an operator wants to drain the fryer,
the waste oil pump located in the waste pipe is activated and
waste cooking oil is delivered from the fryer vat to the waste
oil tank.  (Id.)  The Oilmatic System does not contain a filter
and does not use control valves to select pipe paths from a
common network of piping.  (Id. at 1; Civil Action No. 06-0363
(MLC), dkt. entry no. 1, Compl., at ¶ 13.)  However, the

particular restaurant using the Oilmatic System may add an
integrated filter system or employ a mobile filter system.
(Defs. Br., at 9; Civil Action No. 06-0363 (MLC), dkt. entry no.
1, Compl., at ¶ 18.)

Oilmatic services its Oilmatic System, including periodic
removal of waste oil from the waste oil tank and refilling of the
fresh oil tank.  (Civil Action No. 06-0363 (MLC), dkt. entry no.
1, Compl., at ¶ 14.)  Thus, the Oilmatic System eliminates (1)
the need to purchase new oil boxes, (2) the splashing of heated
oil when new oil is added to frying vats that are already
partially filled, and (3) the need to remove hot oil from the
fryer vat by the conventional method of draining such oil into a
bucket and then manually transporting the contents of the bucket
to a storage tank.  (Id. at ¶ 16.)  Klee's and Jersey Shore,
among other restaurants, utilize the patented Oilmatic System.
(Id. at ¶ 17.)

RTI alleges that "Oilmatic's infringing conduct includes but
is not limited to the manufacture, distribution, and use of its
'OilMatic Bulk Cooking Oil Supply & Management System', which
when used with oil filtering equipment, meets all the limitations
of one or more claims of the '511 patent."  (Dkt. entry no. 13,
RTI Ans. & Counterclaim, at 9.)  Similarly, RTI alleges that
Klee's and Jersey Shore's infringing conduct includes but is not
limited to their use of the Oilmatic System with oil filtering

10

equipment.  (Dkt. entry no. 1, Compl., at ¶ 8; Civil Action No.
05-5358, dkt. entry no. 1, Compl., at ¶ 8.)  In contrast,
Oilmatic contends that "the scope of [RTI's] claimed invention is
not sufficiently broad to cover the systems provided by Oilmatic
and/or utilized by Oilmatic's customers."  (Civil Action No. 06-
0363, dkt. entry no. 1, Compl., at ¶ 24.)

### DISCUSSION AND CONCLUSIONS OF LAW

**I.   Applicable Legal Standards**

**A.   Infringement Standard**

An infringement inquiry is a two-step process.  First, the
Court must determine the scope and meaning of the patent claims
as a matter of law.  Markman, 52 F.3d at 979.  Second, the
allegedly infringing product is compared to each claim at issue
to determine whether the product contains every limitation
contained in each claim or the substantial equivalent of any
limitation not literally present.  Laitram Corp. v. Rexnord,
Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991).

There is a "'heavy presumption' that a claim term carries
its ordinary and customary meaning."  CCS Fitness Inc. v.
Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).  The
ordinary and customary meaning of a claim term is the meaning a
"person of ordinary skill in the art in question" would give to
such term on the effective filing date of the patent application.
Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Such a person is deemed to interpret the claim term in the context of the entire patent, including the specification.  <u>Id.</u>  A claim term should generally be given its ordinary meaning unless the patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history."  <u>CCS Fitness Inc.,</u> 288 F.3d at 1366.  Thus, words in a claim are generally given their ordinary and customary meanings in the absence of a contrary indication in the patent specification or file history.  <u>Wolverine Worldwide, Inc. v. Nike, Inc.,</u> 38 F.3d 1192, 1196 (Fed. Cir. 1994).

When interpreting an asserted patent claim, the Court should look first to the intrinsic evidence of record, which includes the patent's claims, specification, and complete prosecution history.  <u>Markman,</u> 52 F.3d at 979.  Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.  <u>Vitronic Corp. v. Conceptronic, Inc.,</u> 90 F.3d 1576, 1583 (Fed. Cir. 1996).  In reviewing this intrinsic evidence, the Court considers the context in which a term is used both within the claim at issue and within the claims that are not at issue.  <u>Phillips,</u> 415 F.3d at 1314.  Further, the Court must interpret claim terms in light of the specification.  <u>Id.</u> at 1315 (noting that the specification is highly relevant to claim construction and usually dispositive).

The Court, in addition to reviewing the specification, should also consider the patent's prosecution history.  Id. at 1317; Graham v. John Deere Co., 383 U.S. 1, 33 (1966) ("It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office.").  The doctrine of "prosecution history estoppel" requires that a patent's claims be interpreted in light of all United States Patent & Trademark Office ("PTO") proceedings that occurred during the patent application process.  Festo Corp. v. Shoketsu Kinzoku Co., Ltd., 535 U.S. 722, 733 (2002) (noting that "prosecution history estoppel" ensures that claims are interpreted in light of those claims that were cancelled or rejected).  Accordingly, the prosecution history is useful in claim construction because it demonstrates how the inventor limited the invention during the course of the patent prosecution, and thus, narrowed the scope of the ultimately patented product.  Phillips, 415 F.3d at 1317.  Nevertheless, because the prosecution history reflects the ongoing negotiations between the inventor and the PTO, it is often less clear and less useful than the specification.  Id.

The ordinary meaning of claim language as understood by a person of skill in the art will be readily apparent to a lay judge in some instances, after he or she reviews the intrinsic

13

evidence, and claim construction will involve simply applying the widely accepted meanings of commonly understood words.  Id. at 1314.  In such circumstances, general purpose dictionaries may be helpful.  Id.  However, "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  Id. at 1321.

### B.   Means-Plus-Function Analysis

35 U.S.C. § ("Section") 112, paragraph 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts, described in the specification and equivalents thereof.

35 U.S.C. § 112.  This provision permits a patentee to recite a function to be performed as a claim limitation without also reciting the structure needed to perform such function.  Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1322 (Fed. Cir. 2003) However, this provision only applies to purely functional claim limitations that do not describe the structure that performs the recited function.  Phillips, 415 F.3d at 1311.  Moreover, "[m]erely claiming a step by itself, or a series of steps, without recital of a function does not trigger the application of [Section] 112, paragraph 6."  Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1028 (Fed. Cir. 2002).

14

A claim limitation containing the term "means" is presumptively subject to a means-plus-function analysis under Section 112, paragraph 6.  Linear Tech. Corp. v. Impala Linea Corp., 379 F.3d 1311, 1319 (Fed. Cir. 2004); see Mass. Inst. of Tech. v. Abacus Software, 462 F.3d 1344, 1353 (Fed. Cir. 2006). In contrast, a claim limitation lacking the term "means" is presumptively not subject to a means-plus-function analysis, but such presumption may be overcome if the limitation does not recite sufficiently definite structure or recites a function without citing a structure for performing that function.  Mass. Inst. of Tech., 462 F.3d at 1353.  In determining if a claim term connotes sufficient structure, the Court considers whether "the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function."  Id. at 1356 (concluding that "aesthetic correction circuitry" connotes sufficient structure, and thus, is not a means-plus-function limitation).  For example, claim limitations using terms such as "mechanism", "element", or "device" typically do not connote sufficiently definite structure, and thus, should be construed as means-plus-function limitations.  Id. at 1354 (affirming district court conclusion that limitation containing the phrase "colorant selection mechanism" should be construed as a means-plus-function

15

limitation).  A claim limitation using the term "circuit" coupled with a description of the circuit's function, however, connotes sufficient structure to avoid means-plus-function treatment.  <u>Id.</u> at 1355; <u>Linear Tech. Corp.</u>, 379 F.3d at 1320.

Construction of a means-plus-function claim limitation is a two-step process.  <u>Omega Eng'g, Inc.</u>, 334 F.3d at 1322.  Both steps involve questions of law for the Court.  <u>Linear Tech. Corp.</u>, 379 F.3d at 1322; <u>see Kudlacek v. DBC, Inc.</u>, 25 Fed.Appx. 837, 842 (Fed. Cir. 2001).  First, the Court must identify the claimed function in light of the claim language.  <u>Linear Tech. Corp.</u>, 379 F.3d at 1322; <u>Epcon Gas Sys., Inc.</u>, 279 F.3d at 1032. The Court cannot adopt a function different than what is explicitly recited in the claim, and cannot narrow or limit the claimed function beyond the scope of the claim language.  <u>Versa Corp. v. Ag-Bag Int'l Ltd.</u>, 66 Fed.Appx. 853, 855 (Fed. Cir. 2003); <u>see Omega Eng'g, Inc.</u>, 334 F.3d at 1322.  Once the function is identified, the Court must determine what structures disclosed in the specification correspond to that function. <u>Omega Eng'g, Inc.</u>, 334 F.3d at 1322; <u>Epcon Gas Sys., Inc.</u>, 279 F.3d at 1032.  "A disclosed structure is corresponding 'only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.'" <u>Omega Eng'g, Inc.</u>, 334 F.3d at 1322 (citation omitted). Accordingly, the structure must be necessary to performance of

16

the claimed function.  Id.  "Proper application of [Section 112, paragraph 6] generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function."  Linear Tech. Corp., 379 F.3d at 1322.

The judicially developed doctrine of "claim differentiation", which states that different claims should be presumed to cover different inventions, cannot override or alter a means-plus-function analysis.  Laitram Corp., 939 F.2d at 1538. Thus, "[a] means-plus-function limitation is not made open-ended by the presence of another claim specifically claiming the disclosed structure which underlies the means clause or an equivalent of that structure."  Id.

Once the means-plus-function analysis is complete, the Court can determine whether the allegedly infringing device literally infringes that particular patent claim.  "Literal infringement of a [Section 112, paragraph 6] claim requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification."  Versa Corp., 66 Fed.Appx. at 856.  In other words, to prove literal infringement, the plaintiff must show that the means in the accused device is at least structurally equivalent to the means described in the patent specification.  Laitram Corp., 939 F.2d at 1536.

17

## II.  Legal Standards Applied Here

We will now discuss each claim construction issue raised by the parties.

### A.   Claim 1

#### 1.   The Preamble

The preamble of claim 1 describes a "bulk cooking oil system having various stations connected by piping for movement of oil along preselected pipe paths".  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 10, lines 55-57.)  RTI argues that it is not necessary for the Court to interpret the preamble because it is not a claim limitation.  (RTI Br., at 7.)  Defendants argue, however, that the preamble should be interpreted as a claim limitation, which describes a network of interconnected pipe lines used for moving oil along preselected paths from one station to another.  (Defs. Br., at 15.)

"A claim preamble has the import that the claim as a whole suggests for it."  Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999).  If the preamble recites claim limitations or is "necessary to give life, meaning, and vitality" to the claim, then the preamble must be construed as if it were located in the body of the claim.  Id.; Bicon, Inc. v. Straumann Co., 441 F.3d 945, 952 (Fed. Cir. 2006) (explaining that the preamble is considered limiting if it recites structure important to the invention or necessary to give meaning to the claim).

18

However, if the body of the claim "fully and intrinsically sets forth the complete invention" and the preamble does not provide a distinct definition needed for interpreting any of the claimed invention's limitations, then the Court should not consider the preamble in its claim construction analysis. Pitney Bowes, Inc., 182 F.3d at 1305.  Accordingly, the preamble is not significant if it merely states, for example, the purpose or intended use of the claimed invention.  Id.; Bicon, Inc., 441 F.3d at 952 ("Preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim.").  Thus, "whether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent."  Bicon, Inc., 441 F.3d at 952.

The Court finds that the preamble of claim 1 is not necessary to give meaning or vitality to that claim, and thus, the Court need not construe its language.  See Pitney Bowes, Inc., 182 F.3d at 1305.  Instead, the preamble simply gives an overview of the invention it will subsequently describe and states the intended use of such invention - to move cooking oil along preselected pipe paths between various stations.  See id.; Bicon, Inc., 441 F.3d at 952.  None of claim 1's limitations are rendered meaningless without reference to the preamble.  Further, the body of claim 1 recites a complete invention without

referring back to any definitions or features described in the preamble. See Bicon, Inc., 441 F.3d at 952-53. Therefore, because claim 1's limitations do not derive their antecedent basis from the preamble, this Court concludes that the claim drafter did not intend to use both the preamble and the body of claim 1 to define the subject matter of the claimed invention. See id. at 953 (noting that references in the body of the claim at issue derived their antecedent basis from the preamble and concluding that the claim drafter chose to use both the preamble and the claim body to describe the invention).

### 2.   Claim 1(a)(i) - "means for filtering"

The parties initially disputed the proper construction of "means for filtering" in limitation (a)(i) of claim 1. However, Defendants now withdraw their "proffered claim construction for the 'filter means' and accept[] RTI's claim construction for the limitation as 'any filter that performs the recited function of filtering cooking oil from the fryer station." (Defs. Ltr. Resp. Br., at 10.) Therefore, the Court adopts this interpretation.

### 3.   Claim 1(a)(ii), (b)(ii), (c)(ii), and (d)(ii) - "valve means"

Limitations (a)(ii), (b)(ii), (c)(ii), and (d)(ii) of claim 1 each refer to a type of "valve means". (Dkt. entry no. 1, Ex. A, '511 patent, at col. 10, line 61 ("filter valve means"), line 65 ("waste valve means") & col. 11, line 3 ("supply valve means"), line 9 ("fryer valve means").) RTI asserts that this

language is not subject to a means-plus-function analysis under
Section 112, paragraph 6 because it expressly sets forth the
structure necessary to perform the recited functions - a valve.
(RTI Br., at 13.).  In contrast, Defendants contend that these
clauses must be interpreted as means-plus-function limitations.
(Defs. Br., at 16-19.)

Each of the claim 1 limitations referring to some type of
"valve means" are presumptively subject to a means-plus-function
analysis under Section 112, paragraph 6 because they contain the
term "means".  See Linear Tech. Corp., 379 F.3d at 1319.
However, this presumption is overcome here because these
limitations are not purely functional in nature, but instead
describe the structure that performs the functions recited.  See
Phillips, 415 F.3d at 1311.  Specifically, limitations (a)(ii),
(b)(ii), (c)(ii), and (d)(ii) of claim 1 describe a valve as the
structure that opens and closes pipe lines leading to and away
from the filter station, waste station, supply station, and fryer
station.  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 10,
lines 61-62, lines 65-67 & col. 11, lines 3-5, lines 9-10.)  The
term "valve" is used in common parlance to designate a broad
class of structures.  See Mass. Inst. of Tech., 462 F.3d at 1356
(noting that a claim term connotes structure if it is used in
common parlance to connote structure, even if it covers a broad
class of structures).  Therefore, the Court finds that

21

limitations (a)(ii), (b)(ii), (c)(ii), and (d)(ii) of claim 1 are not subject to a means-plus-function analysis, and thus, they should be construed according to the plain and ordinary meaning of their terms.

The term "valve" has widely accepted meanings.  See Phillips, 415 F.3d at 1314 (explaining that the ordinary meaning of claim language will often be readily apparent to a lay judge, and thus, claim construction will involve simply applying the widely accepted meanings of commonly understood words). Webster's Ninth New Collegiate Dictionary defines "valve" as, inter alia, (1) "a structure . . . that closes temporarily a passage or orifice or permits movement of fluid in one direction only", and (2) "any of numerous mechanical devices by which the flow of liquid, gas, or loose material in bulk may be started, stopped, or regulated by a movable part that opens, shuts or partially obstructs one or more ports or passageways".  Webster's Ninth New Collegiate Dictionary 1303 (1991); see Phillips, 415 F.3d at 1314 (noting that general purpose dictionaries may assist courts in determining widely accepted meanings of commonly used words).  However, the Court must read such dictionary definitions in conjunction with the '511 patent's intrinsic evidence, which includes the specification and all claims.  See Phillips, 415 F.3d at 1321 (stating that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the

meaning of the claim term to the artisan into the meaning of the term in the abstract"). Accordingly, in light of the description set forth in the specification and the language of claim 1, the Court finds that the term "valve" in claim 1 encompasses any device that starts, stops, regulates, or controls the movement of liquid in a particular direction or down a particular pathway.

The Court also finds that the language of limitation (a)(ii) of claim 1, which describes "filter valve means for opening and closing pipe lines leading to and away from said filter station", necessitates more than one valve to perform the recited function. (Dkt. entry no. 1, Ex. A, '511 patent, at col. 10, lines 61-62 (emphasis added).) However, the Court concludes that limitations (b)(ii), (c)(ii), and (d)(ii), which describe various "valve means for opening and closing a pipe line leading to and away from" a station, necessitate only one valve to perform the recited functions, but permit the use of more than one valve. (Id. at col. 10, lines 65-67 & col. 11, lines 3-5, lines 9-10 (emphasis added).) The Court acknowledges that the '511 patent's specification describes a system where the functions recited in limitations (a)(ii), (b)(ii), (c)(ii), and (d)(ii) are each performed by a set of two valves. (See id. at col. 4, line 42 through col. 10, line 53.) Nevertheless, this Court will not read the specification as imposing limitations on the '511 patent's claims, particularly because we have already determined

that these limitations are not subject to a means-plus-function
analysis, which would require the Court to look to the
specification to identify the corresponding structures.  See
Phillips, 415 F.3d at 1323 (warning against confining claims to
the preferred embodiment and rejecting contention that if a
patent describes only one preferred embodiment, the claims of the
patent must be limited in accordance with that embodiment).
Accordingly, the Court finds that the structures corresponding to
the function set forth in limitation (a)(ii) are at least two
valves.  We further find that the structure(s) corresponding to
the functions set forth in limitations (b)(ii), (c)(ii), and
(d)(ii) are one or more valves for each of those three
limitations.

### 4.    Claim 1(d)(iii) - "means for metering oil to said fryer in predetermined amounts"

Limitation (d)(iii) of claim 1 states, "means for metering
oil" to the fryer in predetermined amounts.  (Dkt. entry no. 1,
Ex. A, '511 patent, at col. 11, lines 12-13.)  The parties agree
that this language is subject to a means-plus-function analysis.
(RTI Br., at 16; Defs. Br., at 19.)  However, RTI asserts that
this language encompasses a valve, nozzle, switch, or any other
structure that performs the recited function of metering oil to
the fryer station.  (RTI Br., at 17.)  The Defendants contend
that according to the specification, this language does not

24

encompass any valve, nozzle, or switch, but instead encompasses only a manually operated valve.  (Defs. Br., at 20.)

The function explicitly recited in limitation (d)(iii) of claim 1 is metering oil to the fryer in predetermined amounts. See Versa Corp., 66 Fed.Appx. at 855.  "Metering oil" entails supplying oil in a regulated or measured amount.  See Merriam-Webster Dictionary (2005) (defining "metering").  Thus, the metering of oil to the fryer does not begin when (1) oil is placed into the system, (2) a valve is opened releasing oil into one of the pipe lines, (3) the pump is activated, or (4) oil travels along a preselected pipe path.  Instead, the metering begins only when oil is directly supplied or placed into the fryer vat.

The specification contains the following statements, which reference certain figures or drawings contained in the '511 patent, pertaining to the recited function of metering oil to the fryer in predetermined amounts[2]:

> Fryer station 20 comprises a pair of valves 46 and 48
> positioned in pipe lines intersecting with a coupling
> attached to one end of flexible line 50.  The other end
> of flexible line 50 contains squeezable nozzle valve 52
> adapted to be inserted in a fryer vat 44. . . .  The

---

[2] The Court found several clerical errors in the '511 patent's specification, particularly with respect to the specification's references to the Figures contained in the '511 patent.  We have corrected those clerical errors that appear in the specification provisions discussed in this opinion using brackets.

function of the fryer station 20 is to allow the proper
metering of fresh or recycled filtered oil into the
fryer vat.  (Dkt. entry no. 1, Ex. A, '511 patent, at
col. 5, lines 17-21.)

Cycle 2 commences with the opening of supply valve 40
and fryer valve 46.  All other valves remain closed.
An operator then places trigger valve 52 having a
nozzle 52*a* into a selected fryer vat and squeezes
trigger valve 52 into an open position.  Cooking oil
follows the selected pipe path extending from tank 36
through open valve [40], pump 18, open valve 46,
flexible line 50, and open trigger valve 52 into vat
44.  (Id. at col. 5, lines 55-62.)

Pipe line 154 is connected to a flexible hose 155
containing a squeezable trigger valve 156 with a nozzle
156*a* capable of being inserted into a fryer vat.  (Id.
at col. 8, lines 64-66.)

Flexible hose 155 with the squeezable trigger [valve]
156 with nozzle 156*a* is inserted into the target fryer
vat and trigger valve 156 is squeezed open, placing the
desired amount of cooking oil directly into the fryer
vat.  (Id. at col. 9, lines 52-56 (bracketed matter
added).)

A flexible hose 206 coupled to apparatus 60 is
connected to a pipe line 208 and flexible hose 210
leading to trigger valve 212 and nozzle 212*a* removably
mounted appropriately on a wall 214 adjacent [to] vats
204.  An operator may thus remove flexible hose 210 and
trigger valve 212 from its mounting and insert nozzle
into one of the vats 204 as desired for the cycle
selected.  (Id. at col. 10, lines 28-35 (bracketed
matter added.)

The various operation cycles and manually operated
valves may be completely or partially automated, using
microprocessor based controls.  (Id. at col. 10, lines
46-49.)

See Omega Eng'g, Inc., 334 F.3d at 1322 (explaining that once the

function is identified, the Court must determine what structures

disclosed in the specification correspond to that function);

Epcon Gas Sys., Inc., 279 F.3d at 1032 (explaining same).  Based

on these statements, the Court finds that the structure necessary to supply oil to the fryer in measured or regulated amounts is a trigger valve having a nozzle, which opens when the valve is squeezed (i.e. a squeezable trigger valve with a nozzle). Thus, the Court disagrees with RTI's contention that any valve, nozzle, or switch that performs the recited function is covered by limitation (d)(iii) because the specification only discloses a squeezable trigger valve having a nozzle. Nevertheless, the Court agrees with RTI that such trigger valve may be electronically, rather than manually, "squeezed". The specification does not limit such trigger valve to a manually operated valve, but instead states that all manually operated valves disclosed therein may be completely or partially automated using microprocessor based controls. (Dkt. entry no. 1, Ex. A, '511 patent, at col 10, lines 46-49.). Thus, the structure corresponding to the function recited in limitation (d)(iii) of claim 1 is a manually or electronically operated trigger valve with a nozzle.

### 5.   Claim 1(e) - "control means"

Limitation (e) of claim 1 states, "control means for selectively operating said filtering, waste[,] supply and fryer valve means and for selecting a pipe path between a predetermined pair of said stations". (Id. at col. 11, lines 14-17.) The parties agree that this language is subject to a means-plus-

27

function analysis.  (RTI Br., at 19; Defs. Br., at 20.)  However, the parties disagree about the structure that corresponds to the recited functions of operating the various valve means and selecting a pipe path between a pair of stations.  RTI asserts that "the 'control means' of claim 1 encompasses any manual or electrical system that performs the recited function of selectively operating the filtering, waste, supply and fryer valve means and selecting a pipe path between a predetermined pair of stations."  (RTI Br., at 20.)  In contrast, the Defendants contend that the Court must limit its interpretation of "control means" to microprocessor control means only because a manual system would require both knobs to open and close the valves and human intervention to select the pipe path, but a human cannot be a claimed structure.  (Defs. Br., at 21-22.)

The functions explicitly recited in limitation (e) of claim 1 are (1) selectively operating the filtering, waste, supply and fryer valve means, and (2) selecting a pipe path between a predetermined pair of stations.  See Versa Corp., 66 Fed.Appx. at 855.  The specification contains the following statements, which reference certain figures or drawings contained in the '511 patent, pertaining to these recited functions:

> Valves 26 and 28 ca[n] be either manually operated or operated electronically as desired.  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 4, lines 56-58.)
> [W]aste valves 32 and 34 may be operated either manually or electronically through a variety of well

known valves.  (Id. at col. 4, lines 67-68 & col. 5, line 1.)

Selecting the pipe path selected for an appropriate cycle can be accomplished either by manually opening and closing appropriate valves as is discussed below, or electronically through a controller such as a panel controller that provides signals to the appropriate valves when a particular cycle is selected. Microprocessor controls for controlling the opening and closing solenoid operated valves are well known.  (Id. at col. 6, lines 46-53.)

The front panel 82 mounts a plurality of push-pull knobs. . . .  Each knob is connected to a valve as discussed below.  By pulling a knob, an associated valve is manually opened.  Pushing the knob into contact with the front of the panel closes its associated valve.  (Id. at col. 8, lines 10-16.)

The operating rods are mounted for sliding movement toward and away from the front wall of housing 62 and the front wall of panel 82.  FIGS. 15 and 16 depict a linkage structure suitable for the operating of valves 138-152.  For example, operating rod 122a is pivotally connected to lever arm 138a of valve 138, thus operatively connecting knob 122 to valve 138.  By pushing or pulling knob 122 between the travel limits imposed by notches 123 on rod 122a (or alternatively protuberances on the rod) in cooperation with the front panel 82, the lever arm 138a of valve 138 can be moved, thus opening or closing valve 138 as desired.  Each of the other valves can be operated manually in a similar manner.  (Id. at col. 8, lines 43-56.)

To cause the oil to pass through filter a number of times, knobs 126 and 132 are pulled, opening both filter entrance and exit valves 142 and 148.  (Id. at col. 9, lines 64-67.)

In the case of pumping direct from the fryer, the operator first opens valves 144 and 150 by pulling knobs 128 and 134. . . .  (Id. at col. 10, lines 9-11.)

Knob 124 is pulled, opening waste tank exit valve 140, allowing the used oil to be pumped through attachment 111 into the waste disposal line.  (Id. at col. 10, lines 21-23.)

The various operation cycles and manually operated valves may be completely or partially automated, using microprocessor based controls.  (Id. at col. 10, lines 46-49.)

29

See Omega Eng'g, Inc., 334 F.3d at 1322 (explaining that once the
function is identified, the Court must determine what structures
disclosed in the specification correspond to that function);
Epcon Gas Sys., Inc., 279 F.3d at 1032 (same).  Accordingly,
there are multiple references in the specification establishing
that manual as well as electrical control systems are encompassed
by limitation (e) of claim 1.  Thus, the Court concludes that the
corresponding structures disclosed in the specification that are
necessary for selectively operating the various valve means and
selecting a pipe path between stations are a manual system of
push-pull knobs, or a partially or completely automated system
comprised of microprocessor controls.  See Linear Tech. Corp.,
379 F.3d at 1322 (noting that Section 112, paragraph 6 permits a
claim element to embrace alternative described structures for
performing a claimed function).

     The Court notes that there will be some level of human
intervention in every patent.  Such intervention is permissible
as long as a human is not included in the patent as a claimed
structure, but instead merely operates a claimed structure.  See
Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,
412 F.3d 1291, 1300 (Fed. Cir. 2005) (stating that a human being
cannot constitute a "means", and noting that it must determine
what structure the human being operates to perform the recited
function).  Here, the '511 patent's specification describes a

30

manual system where a human being will operate knobs, which open
and close the various valve means and select a pipe path between
stations.  Therefore, construing limitation (e) of claim 1 as
encompassing manual as well as electronic systems for performing
the recited functions does not infer that human intervention is
claimed as part of the corresponding structure.

### 6.   Claim 1(f) - "pump means"

Limitation (f) of claim 1 states a "pump means" for moving
oil along a selected pipe path.  (Dkt. entry no. 1, Ex. A, '511
patent, at col. 11, lines 18-19.)  RTI asserts that this language
is not subject to a means-plus-function analysis under Section
112, paragraph 6 because it expressly sets forth the structure
necessary to perform the recited function - a pump.  (RTI Br., at
21.)  Defendants contend, however, that this language is
obviously written in means-plus-function format and must be
interpreted accordingly.  (Defs. Br., at 24.)

Limitation (f) is presumptively subject to a means-plus-
function analysis under Section 112, paragraph 6 because it
contains the term "means".  See Linear Tech. Corp., 379 F.3d at
1319.  However, this presumption is overcome because the
limitation does not contain only functional language, but also
describes the corresponding structure that performs the recited
function.  See Phillips, 415 F.3d at 1311.  Moreover, the Federal
Circuit, in TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am.,

LLC, determined that similar language did not constitute a means-plus-function limitation.  375 F.3d 1126, 1135 (Fed. Cir. 2004). Specifically, the court determined that a patent limitation disclosing a "pumping means for pumping fuel into the reservoir, said means being located within the reservoir in the region of the opening and including a nozzle and a venturi tube in alignment with the nozzle . . ." was not subject to a means-plus-function analysis because it disclosed the structure needed to perform the recited function.  Id.  The Federal Circuit concluded that the proper construction of the "pump means" limitation was "a pump including a nozzle and a venturi tube in alignment with the nozzle."  Id.  Accordingly, the Court finds that limitation (f) of claim 1 is not subject to a means-plus-function analysis, and thus, should be construed according to its plain and ordinary meaning.

The term "pump" is commonly used and has a widely accepted meaning.  See Phillips, 415 F.3d at 1314 (explaining that the ordinary meaning of claim language will often be readily apparent to a lay judge, and thus, claim construction will involve simply applying the widely accepted meanings of commonly understood words).  Webster's Ninth New Collegiate Dictionary defines "pump" as, inter alia, "a device that raises, transfers, or compresses fluids . . . esp[.] by suction or pressure or both."  Webster's Ninth New Collegiate Dictionary 954 (1991); see Phillips, 415

32

F.3d at 1314 (noting that general purpose dictionaries may assist courts in determining widely accepted meanings of commonly used words).  Further, the specification refers to the "pump" as the structure that "delivers" cooking oil down a selected pipe path without limiting the type of pump or describing any necessary characteristics with respect to the pump.  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 5, lines 10-12.)  Therefore, after reviewing the plain language of the '511 patent's claims and the relevant portions of the specification, this Court finds that the term "pump" in limitation (f) of claim 1 encompasses any device that delivers fluids.

The Court also finds that the language of limitation (f) of claim 1 necessitates only a single pump to perform the recited function, but permits the use of multiple pumps.  (Id. at col. 11, lines 18-19.)  The Court notes that the specification describes a system where only a single pump is used to move oil along whatever pipe path is selected in a particular cycle.  (See id. at col. 4, line 42 through col. 10, line 53.)  Nevertheless, this Court will not read the specification as imposing limitations on the '511 patent's claims, particularly because we have already determined that limitation (f) is not subject to a means-plus-function analysis, which would require the Court to look to the specification to identify the corresponding structures.  See Phillips, 415 F.3d at 1323 (warning against

33

confining claims to the preferred embodiment and rejecting
contention that if a patent describes only one preferred
embodiment, the claims of the patent must be limited in
accordance with that embodiment).  Thus, the Court finds that the
structure recited in limitation (f) of claim 1 is one or more
pumps.[3]

### B.   Claim 2

Claim 2 states:

> The system of claim 1 wherein said filter valve [means]
> in response to said control means is in an open state
> in which the pipe line leading to and away from said
> filter station is open and wherein said waste valve
> mean [sic], said supply valve means, and said fryer
> valve means in response to said control means are all
> in closed states in which the respective pipe lines
> leading to and away from said waste station, supply
> station and said fryer station are closed thereby
> forming a looped pipe path between said filter station
> and said pump.

(Dkt. entry no. 1, Ex. A, '511 patent, at col. 11, lines 21-30.)

See n.1 supra.

---

[3] Defendants argue that construing "pump means" as
encompassing one or more pumps "would run 'smack into' the prior
art Sherratt prior art system [sic] which also uses a separate
path to fill the fryer and a second separate path to drain the
fryer each with its own pump."  (Defs. Br., at 26.)  However,
this Court finds that the '511 patent describes a unique system
comprised of many components, including pipe paths, valves,
controls and filter, storage, supply, and waste tanks.
Therefore, the use of a pump is not the only feature that made
this system patentable, and thus, the prior art's use of multiple
pumps does not require this Court to construe the '511 patent as
having only a single pump.

The parties dispute the proper interpretation of claim 2. (RTI Br., at 23; Defs. Br., at 27.)  Interpreting claim 2 in accordance with the ordinary and customary meaning of its terms, the Court concludes that claim 2 describes the system of claim 1 wherein (1) the filter valves are in an open state in response to the control means, (2) the pipe line leading to and away from the filter station is open, (3) all waste valve, fryer valve, and supply valves are closed in response to the control means, (4) the pipe lines leading to and away from the waste station, supply station, and fryer station are all closed, and (5) a looped pipe path between the filter station and the pump is formed.  (See dkt. entry no. 1, Ex. A, '511 patent, at col. 11, lines 20-29.) See CCS Fitness Inc., 288 F.3d at 1366 (noting that claim terms should generally be given their ordinary meaning unless the patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history"). Moreover, neither party has proffered any evidence from the prosecution history indicating that this construction of claim 2 is improper.  Further, the specification states, "[t]o filter the used oil, the operator then initiates cycle 4 by re-opening valve 26 and opening valve 28, thus establishing a closed loop path extending from filter 44 through pump 18 and back to filter 44." (Dkt. entry no. 1, Ex. A, '511 patent, at col. 6, lines 12-15.) Although this statement describes one system that is encompassed

35

in our interpretation of claim 2, we need not confine our
construction of claim 2 to the preferred embodiment.  See
Phillips, 415 F.3d at 1323 (warning against confining claims to
the preferred embodiment and rejecting contention that if a
patent describes only one preferred embodiment, the claims of the
patent must be limited in accordance with that embodiment).
Therefore, nothing in the '511 patent's specification contradicts
our interpretation of claim 2.[4]

### C.   Claim 4

The parties initially disputed the proper construction of
the term "removable filter" in claim 4.  Specifically, Defendants
asserted that the removable filter should be interpreted as a
filter bag.  (Defs. Br., at 27.)  RTI disagreed and asserted that
the word "bag" does not appear in claim 4 and the '511 patent's
specification contemplates the use of various types of filters.
(RTI Br., at 24.)  Nevertheless, in a letter to this Court dated
December 21, 2006, Defendants stated that they withdraw their
"proffered claim construction for the 'filter means' and accept[]
RTI's claim construction for the limitation as 'any filter that
performs the recited function of filtering cooking oil from the
fryer station."  (Defs. Ltr. Resp. Br., at 10.)  Thus, Defendants

_____

[4] Claim 2 depends upon claim 1.  Accordingly, the Court's
holdings with respect to the proper construction of claim 1 apply
equally to claim 2.  We find that claim 2 is consistent with
claim 1 as we construe those two claims.

agree that the '511 patent contemplates the use of any type of filter that can filter oil from the fryer station.   Therefore, the Court adopts this interpretation and interprets claim 4 as describing the system of claim 3 in which the filter station includes any type of removable filter that removes large carbon particles from the cooking oil when it is circulated through such filter.

**D.   Claim 5**

Claim 5 states, "[t]he system of claim 2 wherein said filter valve means and said fryer valve means in response to said control means open pipe lines forming a pipe path from said fryer station to said filter station whereby oil is moved along the path by said pump means."  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 11, lines 37-41.)   The parties dispute the proper interpretation of claim 5.   (RTI Br., at 25; Defs. Br., at 28.) Interpreting claim 5 in accordance with the ordinary and customary meaning of its terms, the Court concludes that claim 5 describes the system of claim 2 wherein (1) the filter valves and fryer valve(s) open pipe lines in response to the control means, (2) a pipe path is formed from the fryer station to the filter station, and (3) oil is moved along that path by the pump means. (See dkt. entry no. 1, Ex. A, '511 patent, at col. 11, lines 37-41.)  See CCS Fitness Inc., 288 F.3d at 1366 (noting that claim terms should generally be given their ordinary meaning unless the

37

patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history."). Neither party has proffered any evidence from the prosecution history or specification indicating that this construction of claim 5 is improper.[5]

**E.   Claim 8**

Limitations (a), (b), and (c) of claim 8 are not at issue here.  However, with respect to this claim, the parties dispute the proper construction of limitations (d), (e), (f), and (g).

**1.   Claim 8(d) - "first and second coupling attachments"**

Limitation (d) of claim 8 claims, "first and second coupling attachments adapted respectively to be coupled to lines leading to a fryer and to egress from said apparatus".  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 12, lines 5-7.)  The parties dispute the proper interpretation of this limitation.  (RTI Br., at 26; Defs. Br., at 28.)  Interpreting limitation (d) of claim 8 in accordance with the ordinary and customary meaning of its terms, the Court concludes that it describes (1) one or more first coupling attachments adapted to be coupled to one or more

_____

[5] Claim 5 depends upon claim 2, which in turn depends upon claim 1.  Accordingly, the Court's holdings with respect to the proper construction of claims 1 and 2 apply equally to claim 5. We find that claim 5 is consistent with claims 1 and 2 as we construe those three claims.

lines leading to a fryer, and (2) one or more second coupling
attachments adapted to be coupled to one or more lines leading to
egress from the claim 8 apparatus.  (See dkt. entry no. 1, Ex. A,
'511 patent, at col. 12, lines 5-7.)  See CCS Fitness Inc., 288
F.3d at 1366.  Neither party has proffered any evidence from the
prosecution history indicating that this construction is
improper.  Further, the specification refers to the coupling
attachments in the following statements:

> To supply fresh oil to the system, an outside line 57
> leading to a remotely located source of fresh oil, such
> as a tank truck or a remotely located storage tank, is
> coupled to quick connect coupling attachment 54.  To
> remove oil from system 10, quick connect coupling
> attachment 56 is coupled to outside line 59 leading to
> a remotely located storage facility such as a tanker
> truck for immediate removal.  (Dkt. entry no. 1, Ex. A,
> '511 patent, at col. 5, lines 26-33.)

> When it is desired to place fresh oil in the system
> (cycle 1), attachment 54 is coupled to outside line 57
> leading to a source of fresh oil, a tanker truck, and
> valve 38 is opened.  (Id. at col. 5, lines 43-46.)

> To remove waste oil entirely from the system,
> attachment 56 is coupled to waste line 57 leading to a
> remote tanker or the like and valve 34 is opened.  (Id.
> at col. 6, lines 40-42.)

> A pair of quick connection couplings 109 and 111 are
> provided to attach the apparatus 60 to a remote source
> of oil or disposal tank having convenient access to
> tankers and the like. (Id. at col. 8, lines 29-32.)

> [F]resh oil can be pumped to storage tank 70 when pump
> 74 is energized, attachment 109 is coupled to a fresh
> oil supply line leading to a remotely located vehicular
> tank and knob 136 is pulled, opening storage tank
> entrance valve 152.  (Id. at col. 9, lines 29-33.)

> [A]ttachments 109 and 111 may, for example, be female
> or male attachments with check valves biased in a
> closed position that prevents flow of liquid in the
> opposite direction from that desired and covered by a

> threaded cap to further prevent flow when not being
> used.  (Id. at col. 9, lines 43-48.)
>
> To rid apparatus 60 of waste oil, attachment [111] is
> coupled to a waste disposal line. . . .  (Id. at col.
> 10, lines 17-18.)

Accordingly, the specification supports the Court's conclusion
that the "coupling attachments" referenced in limitation (d) of
claim 8 must be "adapted to be coupled" to a line leading to a
fryer and a line to egress from the fryer, rather than already
"coupled" to such lines.

### 2.   Claim 8(e) - "piping network"

Limitation (e) of claim 8 claims, "piping network
interconnecting said first and second containers, said filter
unit and said first and second couplings".  (Dkt. entry no. 1,
Ex. A, '511 patent, at col. 12, lines 5-7.)  Defendants argue
that they stay true to the language of this limitation by
interpreting it as "a network of pipelines that interconnects the
various elements."  (Defs. Resp. Br., at 18 (emphasis in
original).)  RTI argues that "Defendants have done no more than
paraphrase the claim language for this claim element, which
suggests that the claim does not need construction."  (RTI Reply
Br., at 19.)  Based on the parties' submissions at this juncture,
the Court believes there is no dispute with respect to limitation
(e) of claim 8, and thus, we will not construe this limitation at
this time, but note that it should be read in accordance with the
ordinary and plain meaning of its terms.

### 3.   Claim 8(f) - "pipe path control means"

Limitation (f) of claim 8 states "pipe path control means for determining a pipe path within said piping between a pair selected from among said first and second containers, said filter unit and said first and second coupling attachments".  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 12, lines 11-15.)  The parties agree that this language is subject to a means-plus-function analysis.  (RTI Br., at 28; Defs. Br., at 29.)  However, the parties disagree about the structure that corresponds to the recited function of determining a pipe path within the piping. RTI asserts that "the 'pipe path control means' recited as element (f) of claim 8 encompasses any manual or electrical system that performs the recited function of determining a pipe path within the piping between a pair of structures selected from the first and second containers, the filter unit, and the first and second attachments."  (RTI Br., at 28.)  In contrast, the Defendants contend that the mental process of determining a pipe path cannot be claimed, and thus, the Court must limit its interpretation of "pipe path control means" to a plurality of electrically operated valves and a microprocessor based controller for sending operating signals to those valves to select a pipe path.  (Defs. Br., at 29.)

The function explicitly recited in limitation (f) of claim 8 is determining a pipe path within the piping between a pair

41

selected from the first and second containers, the filter unit,
and the first and second coupling attachments.  See Versa Corp.,
66 Fed.Appx. at 855.  The specification contains the following
statements, which reference structures corresponding to this
recited function:

> Selecting the pipe path selected for an appropriate
> cycle can be accomplished either by manually opening
> and closing appropriate valves as is discussed below,
> or electronically through a controller such as a panel
> controller that provides signals to the appropriate
> valves when a particular cycle is selected.
> Microprocessor controls for controlling the opening and
> closing solenoid operated valves are well known.  (Dkt.
> entry no. 1, Ex. A, '511 patent, at col. 6 lines 46-
> 53.)
>
> The various operation cycles and manually operated
> valves may be completely or partially automated, using
> microprocessor based controls.  (Id. at col. 10, lines
> 46-49.)

See Omega Eng'g, Inc., 334 F.3d at 1322 (explaining that once the
function is identified, the Court must determine what structures
disclosed in the specification correspond to that function);
Epcon Gas Sys., Inc., 279 F.3d at 1032 (explaining same).
Accordingly, the specification indicates that manually or
electronically operated valves are the structures that correspond
to the recited function of determining a pipe path.  See Linear
Tech. Corp., 379 F.3d at 1322 (noting that Section 112, paragraph
6 permits a claim element to embrace alternative described
structures for performing a claimed function).

42

The Court notes, as previously discussed, that some level of human intervention is permissible in a patent's claims as long as a human is not a claimed structure, but instead merely operates a claimed structure.  See Default Proof Credit Card Sys., 412 F.3d at 1300 (stating that a human being cannot constitute a "means", and noting that it must determine what structure the human being operates to perform the recited function).  Here, the '511 patent's specification describes a manual system where a human being will operate a structure such as a knob, which in turn opens or closes a valve that determines or selects a pipe path between certain structures.  Therefore, construing limitation (f) of claim 8 as encompassing manual as well as electronic systems for performing the recited function does not infer that human intervention is claimed as part of the corresponding structure.

### 4.   Claim 8(g) - "pump means"

Limitation (g) of claim 8 describes a "pump means" for circulating cooling oil along a selected pipe path.  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 12, lines 16-17.)  This language is nearly identical to limitation (f) of claim 1.  (See id. at col. 11, lines 18-19.)  Therefore, for the reasons discussed supra, the Court finds that this limitation is not subject to a means-plus-function analysis.  Further, the Court concludes that its findings set forth in this Discussion and

Conclusions of Law section at II.A.6. with respect to limitation

(f) of claim 1 apply equally to limitation (g) of claim 8.[6]

---

[6] RTI states in its brief that claims 1-6, 8, and 11 of the '511 patent are in dispute.  (RTI Br., at 1.)  However, neither RTI nor Defendants discussed claims 3, 6, or 11 in the papers submitted to this Court or at oral argument on December 6, 2006. Nevertheless, the Court notes that claim 6 depends upon claim 1, and claim 3 depends upon claim 2, which in turn depends upon claim 1.  Thus, the Court's holdings with respect to the proper construction of claims 1 and 2 apply equally to claims 3 and 6. Similarly, claim 11 depends upon claim 8, and thus, the Court's holdings with respect to claim 8 apply equally to claim 11.

**IT IS THEREFORE** on this      6th      day of February, 2007,
**ORDERED** that the Court finds:

(1) the preamble to claim 1 is not necessary to give meaning or vitality to that claim, and thus, the Court need not construe its language (see Disc. and Concl. of Law § II.A.1.),

(2) limitation (a)(i) of claim 1, the parties agree, claims any filter that performs the recited function of filtering cooking oil from the fryer station (see id. at § II.A.2),

(3) limitations (a)(ii), (b)(ii), (c)(ii), and (d)(ii) of claim 1 are not subject to a means-plus-function analysis, and are construed as follows: (a) a valve is the structure that performs the function recited in each of these limitations, (b) the term "valve" describes any device that starts, stops, regulates, or controls the movement of liquid in a particular direction or down a particular pathway, (c) the structures corresponding to the function set forth in limitation (a)(ii) are at least two valves, and (d) the structure(s) corresponding to the functions set forth in limitations (b)(ii), (c)(ii), and (d)(ii) are one or more valves for each of those three limitations (see id. at § II.A.3),

(4) the structure necessary to perform the function of supplying oil to the fryer in measured or regulated amounts, recited in limitation (d)(iii) of claim 1, is construed as a

manually or electronically operated trigger valve with a nozzle (see id. at § II.A.4),

(5) the structures necessary to perform the functions of selectively operating the various valve means and selecting a pipe path between stations, recited in limitation (e) of claim 1, are construed as a manual system of push-pull knobs, or a partially or completely automated system comprised of microprocessor controls (see id. at § II.A.5),

(6) limitation (f) of claim 1 is not subject to a means-plus-function analysis, and is construed as follows: (a) a pump is the structure that performs the function recited in this limitation, (b) the term "pump" describes any device that delivers fluid, and (c) the structure(s) corresponding to the function set forth in limitation (f) of claim 1 is one or more pumps (see id. at § II.A.6),

(7) claim 2 is construed as the system of claim 1 wherein the filter valves are in an open state in response to the control means, the pipe line leading to and away from the filter station is open, all the waste valve, fryer valve, and supply valves are closed in response to the control means, the pipe lines leading to and away from the waste station, supply station, and fryer station are all closed, and a looped pipe path between the filter station and the pump is formed (see id. at § II.B),

46

(8) claim 4, the parties agree, claims the system of claim 3 in which the filter station includes any type of removable filter that removes large carbon particles from the cooking oil when it is circulated through such filter (see id. at § II.C),

(9) claim 5 is construed as the system of claim 2 wherein the filter valves and fryer valve(s) open pipe lines in response to the control means, a pipe path is formed from the fryer station to the filter station, and oil is moved along that path by the pump(s) (see id. at § II.D),

(10) limitation (d) of claim 8 is construed as one or more first coupling attachments adapted to be coupled to one or more lines leading to a fryer, and one or more second coupling attachments adapted to be coupled to one or more lines leading to egress from the claim 8 apparatus (see id. at § II.E.1),

(11) the parties do not identify any dispute with respect to limitation (e) of claim 8, and thus, the Court will not construe this limitation at this time (see id. at § II.E.2),

(12) the structures necessary to perform the function of determining a pipe path within the piping between a pair selected from among the first and second containers, the filter unit, and the first and second coupling attachments, recited in limitation (f) of claim 8, are construed as manually or electronically operated valves (see id. at § II.E.3), and

47

(13) limitation (g) of claim 8 is not subject to a means-plus-function analysis, and is construed as follows: (a) a pump is the structure that performs the function recited in this limitation, (b) the term "pump" describes any device that delivers fluid, and (c) the structure corresponding to the function set forth in limitation (g) of claim 8 is one or more pumps (see id. at § II.E.4).


    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

48