**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RESTAURANT TECHNOLOGIES, INC.,:
                                :        **MEMORANDUM OPINION**
        Plaintiff,              :
                                :    CIVIL ACTION NO. 05-5356 (MLC)
        v.                      :
                                :
JERSEY SHORE CHICKEN,           :
                                :
        Defendant.              :
_____ :
                                :
RESTAURANT TECHNOLOGIES, INC.,:
                                :    CIVIL ACTION NO. 05-5358 (MLC)
        Plaintiff,              :
                                :
        v.                      :
                                :
KLEE'S BAR & GRILL,             :
                                :
        Defendant.              :
_____ :
                                :
OILMATIC SYSTEMS, LLC,          :
                                :    CIVIL ACTION NO. 06-363 (MLC)
        Plaintiff,              :
                                :
        v.                      :
                                :
RESTAURANT TECHNOLOGIES, INC.,:
                                :
        Defendant.              :
_____ :

**COOPER, District Judge**

Restaurant Technologies, Inc. ("RTI") commenced separate actions against Jersey Shore Chicken ("Jersey Shore") and Klee's Bar & Grill ("Klee's") alleging, inter alia, that they are infringing one or more claims of its United States Patent No. 5,249,511 (the "'511 patent") either literally or under the

doctrine of equivalents.  (Dkt. entry no. 1, Compl., at ¶ 10; No. 05-5358 (MLC), dkt. entry no. 1, Compl., at ¶ 10.)  RTI requests, inter alia, that Jersey Shore and Klee's "be enjoined preliminarily and permanently from infringing the '511 patent". (Dkt. entry no. 1, Compl., at ¶¶ a-c; No. 05-5358 (MLC), dkt. entry no. 1, Compl., at ¶¶ a-c.)

Jersey Shore and Klee's are restaurants, and are customers of Oilmatic Systems, LLC ("Oilmatic"), which provides them with equipment for supplying cooking oil in their kitchens.  Oilmatic commenced an action against RTI "for tortious interference, unfair competition, antitrust, and declaratory judgment arising from RTI's baseless suits and threats against customers of Oilmatic."  (No. 06-363 (MLC), dkt. entry no. 1, Compl., at 1.) Specifically, Oilmatic alleges that beginning in August 2005, "RTI and its representatives and agents began a campaign of threatening customers of the patented Oilmatic [bulk cooking oil supply and management] system with allegations of infringement of the '511 Patent, even though the claims were baseless and unwarranted."  (Id. at ¶ 22.)  Oilmatic seeks, inter alia, a judgment (1) declaring that neither it nor its customers, including Jersey Shore and Klee's, is infringing the '511 patent, (2) preliminarily and permanently enjoining RTI from asserting any patent infringement claims against Oilmatic or its customers in connection with the '511 patent, and (3) declaring that the '511 patent is invalid.  (Id. at ¶¶ A-K.)

2

Oilmatic's action against RTI and RTI's actions against
Klee's and Jersey Shore were consolidated under Civil Action No.
05-5356 (MLC).  (Dkt. entry no. 11, Pretrial Sch. Ord., at ¶ 1.)
Thereafter, RTI filed a counterclaim against Oilmatic alleging,
inter alia, that Oilmatic is infringing one or more claims of the
'511 patent either literally or under the doctrine of
equivalents.  (Dkt. entry no. 13, RTI's Ans. & Countercl., at 9.)
Thus, RTI requests, inter alia, that Oilmatic "be enjoined
preliminarily and permanently from infringing the '511 patent".
(Id. at 10, ¶¶ a-c.)

The parties initially disputed the proper construction of
claims 1-6, 8, and 11 of the '511 patent.  On February 6, 2007,
the Court issued findings of fact and conclusions of law with
respect to its construction of the '511 patent's claims ("2-6-07
Memorandum Opinion").  (Dkt. entry no. 51, 2-6-07 Mem. Op.)
Oilmatic now moves "for an order granting summary judgment that
Oilmatic does not infringe claims 1-5, 8, and 11" of the '511
patent.  (Dkt. entry no. 64.)[1]  Further, RTI cross-moves for
summary judgment of (1) nonanticipation, and (2) infringement of
claim 8 of the '511 patent.  (Dkt. entry nos. 85, 86.)  For the
reasons stated herein, the Court will (1) grant the motion, (2)

_____

[1]  Oilmatic's claim for noninfringement is in the seventh
count of its complaint.  (See No. 06-363 (MLC), dkt. entry no. 1.)
RTI, in turn, asserts a counterclaim for infringement against
Oilmatic.  (See dkt. entry no. 84, Amended Countercl., at 5.)

3

deny the cross motions, (3) enter judgment in favor of Oilmatic, and against RTI, on Oilmatic's claim for noninfringement and RTI's counterclaim for infringement, and (4) order the parties to show cause why judgment should not be entered in favor of Jersey Shore and Klee's, and against RTI, as to (a) their counterclaims against RTI for noninfringement, and (b) RTI's claims against them for infringement.[2]

**BACKGROUND**

**I.   The Parties**

RTI, a Delaware corporation with its principal place of business in Minnesota, owns all right, title, and interest to the '511 patent.  (Dkt. entry no. 1, Compl., at ¶ 1.)  Jersey Shore, Klee's, and Oilmatic are all New Jersey corporations with their principal places of business in New Jersey.  (Dkt. entry no. 4, Jersey Shore's Ans. & Countercl., at 1; No. 05-5358 (MLC), dkt. entry no. 4, Klee's Ans. & Countercl., at 1; No. 06-363 (MLC), dkt. entry no. 1, Compl., at 1.)  Oilmatic manufactures a patented bulk cooking oil supply and management system (the "Oilmatic system") that it asserts is "highly regarded in the industry because it is more universal yet more simple than competing systems."  (Id. at ¶ 12.)

---

[2]   RTI asserts claims for infringement against Jersey Shore and Klee's.  (Dkt. entry no. 1, Compl., at 2; No. 05-5358 (MLC), dkt. entry no. 1, Compl., at 2.)  Jersey Shore and Klee's, in turn, assert counterclaims for noninfringement against RTI. (Dkt. entry no. 4, Ans. & Countercl., at 3; No. 05-5358 (MLC), dkt. entry no. 4, Ans. & Countercl., at 3.)

4

## II.  RTI's '511 Patent

The '511 patent "relates to systems and apparatus for the use of cooking oil and, more particularly, relates to systems and apparatus for the distribution, filtering, removal, and disposal of cooking oil." (Dkt. entry no. 1, Ex. A, '511 patent, at col. 1, lines 7-10.)  The system has filter, waste, supply, and fryer stations connected by piping that enables oil to move along preselected pipe paths.  (Id. at Abstract.)  The '511 patent's specification, which is entitled "Detailed Description of the Preferred Embodiment of the Present Invention", states that the filter station is comprised of a filter and a pair of independently operated filter valves, which may be operated manually or electronically and are positioned respectively in the pipe lines leading to the entrance and exit sides of the filter. (Id. at col. 4, lines 51-58.)

The waste station is comprised of a waste receptacle and a pair of independently operated entrance and exit waste valves, which may be operated manually or electronically and are positioned in the pipe line leading to the receptacle.  (Id. at col. 4, lines 63-68.)  Moreover, the supply station is comprised of a supply storage tank and a pair of independently operated entrance and exit supply valves, which are positioned in the pipe line leading to the tank.  (Id. at col. 5, lines 4-7.)  The fryer station is comprised of a pair of valves, which are positioned in

pipe lines intersecting with a coupling that is attached to one end of a flexible line.  (Id. at col. 5, lines 17-19.)  The other end of the flexible line contains a squeezable nozzle valve that is adapted to be inserted in a fryer vat.  (Id. at col. 5, lines 19-21.)  A pump delivers cooking oil along the path that is designated by the opening and closing of the various valves.  (Id. at col. 5, lines 10-12.)

The specification explains:

Basically, the system is designed to operate in close synchronization with the needs of the user of kitchen cooking equipment.  These needs vary from the introduction of fresh cooking oil into the system and metering of the oil into the frying vat, to the recycling/filtering of used cooking oil, and finally, to the complete removal of waste oil from the system.

(Id. at col. 5, lines 34-40.)  The specification then describes 7 cycles that the system is capable of performing in order to meet these needs.  (Id. at col. 1, line 40 through col. 6, line 60.)  However, the specification notes:

It is clear that those skilled in the art will be able to modify the embodiments of the present invention. . . . For example, other and different valve arrangements may be employed.  The various operation cycles and manually operated valves may be completely or partially automated, using microprocessor based controls.  Automated timing sequences may be incorporated into the system or apparatus.

(Id. at col. 10, lines 42-50.)

The '551 patent contains 15 claims, but only claims 1-5, 8, and 11 are at issue in the present motions.  Of those claims, only claims 1 and 8 are independent; claims 2-5 ultimately depend

6

upon claim 1 and claim 11 depends upon claim 8.  Claims 1 through 5 provide:

    1.  A bulk cooking oil system having various stations connected by piping for movement of oil along preselected pipe paths comprising:
        (a)  a filter station including
            (i)  means for filtering cooking oil from said fryer station and
            (ii) filter valve means for opening and closing pipe lines leading to and away from said filter station;
        (b)  a waste station including
            (i)  means for storing used oil and
            (ii) waste valve means for opening and closing a pipe line leading to and away from said waste station;
        (c)  a supply station including
            (i)  means for storing oil to be used at said fryer station for cooking food products and
            (ii) supply valve means for opening and closing a pipe line leading to and away from said supply station;
        (d)  a fryer station including
            (i)  a fryer for receiving and heating cooking oil to cook food products,
            (ii) fryer valve means for opening and closing a pipe line leading to and from said fryer station, and
            (iii)means for metering oil to said fryer in predetermined amounts;
        (e)  control means for selectively operating said filtering, waste[,] supply and fryer valve means and for selecting a pipe path between a predetermined pair of said stations;
        (f)  pump means for moving oil along said selected pipe path.
    2.  The system of claim 1 wherein said filter valve in response to said control means is in an open state in which the pipe line leading to and away from said filter station is open and wherein said waste valve mean [sic], said supply valve means, and said fryer valve means in response to said control means are all in closed states in which the respective pipe lines leading to and away from said waste station, supply station and said fryer station are closed thereby

forming a looped pipe path between said filter station
and said pump.[3]
3.   The system of claim 2 in which said filter valve
means is a pair of valves.
4.   The system of claim 3 in which said filter station
includes a removable filter for removing large carbon
particles in the cooking oil when circulated there-
through.
5.   The system of claim 2 wherein said filter valve
means and said fryer valve means in response to said
control means open pipe lines forming a pipe path from
said fryer station to said filter station whereby oil
is moved along the path by said pump means.

(Id. at col. 10, lines 55-68 & col. 11, lines 1-42.)

Claims 8 and 11 provide:

8.   Apparatus for the distribution and recycling of
cooking oil comprising:
    (a)   a first container for receiving and storing
        cooking oil;
    (b)   a second container adapted to receive and
        store waste cooking oil;
    (c)   a filter unit for housing a filter used to
        filter particles in used cooking oil;
    (d)   first and second coupling attachments adapted
        respectively to be coupled to lines leading
        to a fryer and to egress from said apparatus;
    (e)   piping network interconnecting said first and
        second containers, said filter unit and said
        first and second couplings;
    (f)   pipe path control means for determining a
        pipe path within said piping between a pair
        selected from among said first and second
        containers, said filter unit and said first
        and second coupling attachments; and
    (g)   pump means for circulating cooking oil along
        said selected path.
. . .

---

[3]   We believe claim 2 contains a clerical error.
Specifically, we believe claim 2 should begin by stating, "[t]he
system of claim 1 wherein said filter valve means in response to
said control means is in an open state. . . ."

8

11.   The apparatus of claim 8 in which said filter is removable from said filter unit.

(Id. at col. 11, lines 49-52 & col. 12, lines 1-17, 29-30.) Thus, the bulk cooking oil and waste removal system described in the '511 patent permits a person standing at the fryer to obtain fresh cooking oil from a remote supply storage tank, remove used oil from the fryer, filter used oil and return it to the fryer, and permanently remove waste oil from the fryer and transport it to a remote waste storage tank.

The following diagrams illustrate the '511 patent:



III. **The Oilmatic System**

The Oilmatic system "generally comprises a fresh oil tank, a
waste oil tank, and piping from each tank connected along
parallel paths to pumps, the piping then leading to a [d]ipstick
nozzle that may be dipped into a fryer vat in order to fill or
remove cooking oil through either of the independent pipe paths."
(No. 06-363 (MLC), dkt. entry no. 1, Compl., at ¶ 13.)  It "is a
simple system having two separate oil paths that are never
interconnected.  There is a supply path and a separate waste oil
path."  (Oilmatic Br., at 9.)[4]  These separate paths are held
together by a fireproof hose covering.  (Id. at 10.)

The dipstick nozzle holds together a short supply nozzle and
a long waste pipe nozzle in one housing unit.  (See id.)  It has
a switch that can be turned to "fill", "off", or "drain".  (Id.)
To fill the fryer, the operator simply moves the dipstick nozzle

_____

[4]  This opinion addresses a motion and two separate cross
motions.  To avoid confusion: (1) Oilmatic's brief in support of
its motion for summary judgment of noninfringement will be
referred to as "Oilmatic Br." (see dkt. entry no. 64-11); (2)
RTI's brief in opposition to Oilmatic's motion for summary
judgment will be referred to as "RTI Br." (see dkt. entry no.
72); (3) RTI's brief in support of its cross motion for summary
judgment of nonanticipation will be referred to as "Dkt. entry no.
85-2"; (4) Oilmatic's brief in opposition to RTI's cross motion
for summary judgment of nonanticipation will be referred to as
"Dkt. entry no. 96"; (5) RTI's brief in support of its cross
motion for summary judgment of infringement of claim 8 will be
referred to as "Dkt. entry no. 86-2"; and (6) Oilmatic's brief in
opposition to RTI's cross motion for summary judgment of
infringement of claim 8 will be referred to as "Dkt. entry no.
95".

switch to "fill" and then depresses and holds the "pump start" push button switch.  (Id.)  This energizes the fresh oil pump and creates "oil pressure in the supply line which, when it reaches a threshold level, will overcome the spring-loaded check valve at the end of the dipstick supply nozzle such that fresh oil will pour from the supply nozzle into the fryer."  (Id. at 10-11.) When the operator releases the pump start button, the pump turns off and oil stops pouring into the fryer.  (Id. at 11.)

To drain the fryer, the operator moves the dipstick nozzle's switch to "drain".  (Id.)  The operator then depresses and holds the "pump start" push button switch, which turns on the waste oil pump located in the waste line.  (Id.)  Once activated, the waste oil pump withdraws the used oil from the fryer vat, through the waste nozzle and waste line, and discards it into the waste oil tank.  (Id.)

According to Oilmatic, its system does not contain a filter and does not use control valves to select pipe paths from a common network of piping.  (No. 06-0363 (MLC), dkt. entry no. 1, Compl., at ¶ 13.)  However, the particular restaurant using the Oilmatic system may add an integrated filter system or employ a mobile filter system.  (Id. at ¶ 18; see Oilmatic Br., at 12.) Oilmatic services its Oilmatic system, including periodic removal of waste oil from the waste oil tank and refilling of the fresh oil tank.  (No. 06-363 (MLC), dkt. entry no. 1, Compl., at ¶ 14.)

11

Thus, the Oilmatic system eliminates (1) the need to purchase new oil boxes, (2) the splashing of heated oil when new oil is added to frying vats that are already partially filled, and (3) the need to remove hot oil from the fryer vat by the conventional method of draining such oil into a bucket and then manually transporting the contents of the bucket to a storage tank.  (Id. at ¶ 16.)  Klee's and Jersey Shore, among other restaurants, utilize the patented Oilmatic system.  (Id. at ¶ 17.)

The following diagrams and pictures depict the Oilmatic system:



RTI alleges that "Oilmatic's infringing conduct includes but is not limited to the manufacture, distribution, and use of its 'OilMatic Bulk Cooking Oil Supply & Management System', which when used with oil filtering equipment, meets all the limitations of one or more claims of the '511 patent." (Dkt. entry no. 13, RTI Ans. & Countercl., at 9.)  Similarly, RTI alleges that Klee's and Jersey Shore's infringing conduct includes but is not limited to their use of the Oilmatic system with oil filtering equipment. (Dkt. entry no. 1, Compl., at ¶ 8; No. 05-5358, dkt. entry no. 1, Compl., at ¶ 8.)  In contrast, Oilmatic contends that "the scope of [RTI's] claimed invention is not sufficiently broad to cover the systems provided by Oilmatic and/or utilized by Oilmatic's customers." (No. 06-363 (MLC), dkt. entry no. 1, Compl., at ¶ 24.)  Oilmatic notes that, unlike the '511 patent, its system does not permit selection of a pipe path out of a common network of piping, but instead, has two pipe lines that are not interconnected.  (Oilmatic Br., at 11.)

## DISCUSSION

### I.   Applicable Legal Standards

#### A.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed.R.Civ.P. 56(c).  The movant
bears the initial burden of showing that there is no genuine
issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
323 (1986).  Once the movant has met this prima facie burden, the
non-movant "must set forth specific facts showing that there is a
genuine issue for trial." Fed.R.Civ.P. 56(e).  A non-movant must
present actual evidence that raises a genuine issue of material
fact and may not rely on mere allegations.  <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable
to the non-movant when deciding a summary judgment motion.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986).  At the summary judgment stage, the Court's role is
"not . . . to weigh the evidence and determine the truth of the
matter but to determine whether there is a genuine issue for
trial." <u>Anderson</u>, 477 U.S. at 249.  Under this standard, the
"mere existence of a scintilla of evidence in support of the
[non-movant's] position will be insufficient [to defeat a Rule
56(c) motion]; there must be evidence on which the jury could
reasonably find for the [non-movant]." <u>Id.</u> at 252.  "By its very
terms, this standard provides that the mere existence of <u>some</u>
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."
<u>Id.</u> at 247-48 (emphasis in original).  A fact is material only if

it might affect the action's outcome under governing law.  <u>Id.</u> at 248.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> at 249-50 (internal citations omitted).

**B.   Infringement Standard**

An infringement inquiry is a two-step process.  First, the Court must determine the scope and meaning of the patent claims as a matter of law.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995).  Second, the allegedly infringing product is compared to each claim at issue to determine whether the product contains every limitation contained in each claim or the substantial equivalent of any limitation not literally present.  <u>Laitram Corp. v. Rexnord, Inc.</u>, 939 F.2d 1533, 1535 (Fed. Cir. 1991) (noting that "the failure to meet a single limitation is sufficient to negate infringement of the claim").

There is a "'heavy presumption' that a claim term carries its ordinary and customary meaning."  <u>CCS Fitness Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  The ordinary and customary meaning of a claim term is the meaning a "person of ordinary skill in the art in question" would give to such term on the effective filing date of the patent application.  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Such a person is deemed to interpret the claim term in the context of the entire patent, including the specification.  Id. A claim term should generally be given its ordinary meaning unless the patentees "clearly set forth a definition of the disputed claim term in either the specification or prosecution history." CCS Fitness Inc., 288 F.3d at 1366.  Thus, words in a claim are generally given their ordinary and customary meanings in the absence of a contrary indication in the patent specification or file history.  Wolverine Worldwide, Inc. v. Nike, Inc., 38 F.3d 1192, 1196 (Fed. Cir. 1994).

When interpreting an asserted patent claim, the Court should look first to the intrinsic evidence of record, which includes the patent's claims, specification, and complete prosecution history.  Markman, 52 F.3d at 979.  Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.  Vitronic Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).  In reviewing this intrinsic evidence, the Court considers the context in which a term is used both within the claim at issue and within the claims that are not at issue.  Phillips, 415 F.3d at 1314.  Further, the Court must interpret claim terms in light of the specification.  Id. at 1315 (noting that the specification is "highly relevant" to claim construction and usually dispositive).

The Court, in addition to reviewing the specification, should also consider the patent's prosecution history.  Id. at 1317; Graham v. John Deere Co., 383 U.S. 1, 33 (1966) ("It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office.").  The doctrine of "prosecution history estoppel" requires that a patent's claims be interpreted in light of all United States Patent & Trademark Office ("PTO") proceedings that occurred during the patent application process.  Festo Corp. v. Shoketsu Kinzoku Co., Ltd., 535 U.S. 722, 733 (2002) (noting that "prosecution history estoppel" ensures that claims are interpreted in light of those claims that were cancelled or rejected).  Accordingly, the prosecution history is useful in claim construction because it demonstrates how the inventor limited the invention during the course of the patent prosecution, and thus, narrowed the scope of the ultimately patented product.  Phillips, 415 F.3d at 1317.  Nevertheless, because the prosecution history reflects the ongoing negotiations between the inventor and the PTO, it is often less clear and less useful than the specification.  Id.

The ordinary meaning of claim language as understood by a person of skill in the art will be readily apparent to a lay judge in some instances, after reviewing the intrinsic evidence,

and claim construction will involve simply applying the widely accepted meanings of commonly understood words. Id. at 1314. In such circumstances, general purpose dictionaries may be helpful. Id. However, "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." Id. at 1321.

### C. Means-Plus-Function Analysis

35 U.S.C. § ("Section") 112, paragraph 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts, described in the specification and equivalents thereof.

35 U.S.C. § 112. This provision permits a patentee to recite a function to be performed as a claim limitation without also reciting the structure needed to perform such function. Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1322 (Fed. Cir. 2003) However, this provision only applies to purely functional claim limitations that do not describe the structure that performs the recited function. Phillips, 415 F.3d at 1311. Moreover, "[m]erely claiming a step by itself, or a series of steps, without recital of a function does not trigger the application of [Section] 112, paragraph 6." Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1028 (Fed. Cir. 2002).

18

A claim limitation containing the term "means" is presumptively subject to a means-plus-function analysis under Section 112, paragraph 6. Linear Tech. Corp. v. Impala Linea Corp., 379 F.3d 1311, 1319 (Fed. Cir. 2004); see Mass. Inst. of Tech. v. Abacus Software, 462 F.3d 1344, 1353 (Fed. Cir. 2006). In contrast, a claim limitation lacking the term "means" is presumptively not subject to a means-plus-function analysis, but such presumption may be overcome if the limitation does not recite sufficiently definite structure or recites a function without citing a structure for performing that function. Mass. Inst. of Tech., 462 F.3d at 1353. In determining if a claim term connotes sufficient structure, the Court considers whether "the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." Id. at 1356 (concluding that "aesthetic correction circuitry" connotes sufficient structure, and thus, is not a means-plus-function limitation).

Construction of a means-plus-function claim limitation is a two-step process. Omega Eng'g, Inc., 334 F.3d at 1322. Both steps involve questions of law for the Court. Linear Tech. Corp., 379 F.3d at 1322; see Kudlacek v. DBC, Inc., 25 Fed.Appx. 837, 842 (Fed. Cir. 2001). First, the Court must identify the claimed function in light of the claim language. Linear Tech.

Corp., 379 F.3d at 1322; Epcon Gas Sys., Inc., 279 F.3d at 1032.
The Court cannot adopt a function different than what is
explicitly recited in the claim, and cannot narrow or limit the
claimed function beyond the scope of the claim language.  Versa
Corp. v. Ag-Bag Int'l Ltd., 66 Fed.Appx. 853, 855 (Fed. Cir.
2003); see Omega Eng'g, Inc., 334 F.3d at 1322.  Once the
function is identified, the Court must determine what structures
disclosed in the specification correspond to that function.
Omega Eng'g, Inc., 334 F.3d at 1322; Epcon Gas Sys., Inc., 279
F.3d at 1032.  "A disclosed structure is corresponding 'only if
the specification or the prosecution history clearly links or
associates that structure to the function recited in the claim.'"
Omega Eng'g, Inc., 334 F.3d at 1322 (citation omitted).
Accordingly, the structure must be necessary to performance of
the claimed function.  Id.  "Proper application of [Section 112,
paragraph 6] generally reads the claim element to embrace
distinct and alternative described structures for performing the
claimed function."  Linear Tech. Corp., 379 F.3d at 1322.

Once the means-plus-function analysis is complete, the Court
can determine whether the allegedly infringing device literally
infringes that particular patent claim.  "Literal infringement of
a [Section 112, paragraph 6] claim requires that the relevant
structure in the accused device perform the identical function
recited in the claim and be identical or equivalent to the

20

corresponding structure in the specification." <u>Versa Corp.</u>, 66 Fed.Appx. at 856.  In other words, to prove literal infringement, the plaintiff must show that the means in the accused device is at least structurally equivalent to the means described in the patent specification.  <u>Laitram Corp.</u>, 939 F.2d at 1536.

   **D.   Anticipation Analysis**

   A patent is presumed to be valid, and each of its claims are presumed valid independent of the validity of other claims.  35 U.S.C. § 282.  A party asserting the invalidity of a patent or one or more of its claims has the burden of establishing such invalidity, which is satisfied only by clear and convincing evidence.  <u>Id.</u>; <u>Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.</u>, 796 F.2d 443, 446 (Fed. Cir. 1986).  Clear and convincing evidence is evidence that proves in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable.  <u>Intel Corp. v. U.S. Int'l Trade Comm'n</u>, 946 F.2d 821, 830 (Fed. Cir. 1991).

   Section 102(b) provides that a person is not entitled to a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States".  35 U.S.C. § 102(b); <u>see</u> <u>Helifix Ltd. v. Blok-Lok, Ltd.</u>, 208 F.3d 1339, 1346 (Fed. Cir. 2000).  Under this provision, the Court can invalidate

a patent as "anticipated" or by reason of the "on-sale bar" or "public use bar".  Helifix Ltd., 208 F.3d at 1346, 1349.

The Court begins an on-sale bar analysis by determining whether the product was "the subject of a commercial offer for sale".  Id. at 1349 (noting that the Supreme Court has held that the on-sale bar applies when two conditions are met before the critical date); see Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1379 (Fed. Cir. 2005) (stating that the Court must evaluate "whether the product was subject to a commercial offer for sale (i.e., was it 'on sale')").  Next, the Court determines whether the invention was ready for patenting at the time it was allegedly on sale.  Invitrogen Corp., 424 F.3d at 1379 (stating that the Court must evaluate "whether the invention was 'ready for patenting' (i.e., was there an 'invention' at the time of the sale)"); Helifix Ltd., 208 F.3d at 1349.

"That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." Pfaff v. Wells Elec., Inc., 525 U.S. 55, 67 (1998); Helifix Ltd., 208 F.3d at 1349-50 (noting that the party asserting the on-sale bar defense would prevail if "at the time of the [trade] show, the method of claim 1 had been reduced

22

to practice"). The party asserting that the patent claim is
invalid by reason of the on-sale bar can show reduction to
practice by demonstrating that any product existed that met the
limitations recited in the claim at issue at the time of the
alleged sale. See Helifix Ltd., 208 F.3d at 1350 ("[R]eduction
to practice of the claimed method does not require reduction to
practice of the specific tool described in the '801 patent, but
merely requires the development of any tool that meets the
limitations recited in the claim.").

The public use bar of Section 102(b) requires the Court to
determine whether the purported use was (1) accessible to the
public, and (2) commercially exploited. Invitrogen Corp., 424
F.3d at 1380. "Thus, the test for the public use prong includes
consideration of evidence relevant to experimentation as well as,
inter alia, the nature of the activity that occurred in public;
public access to use; confidentiality obligations imposed on
members of the public who observed the use; and commercial
exploitation". Id.

## II.  Legal Standards Applied Here

### A.   Oilmatic's Motion

#### 1.   Claim 1

Oilmatic argues that its system does not contain limitations
d(iii) or (e) of claim 1, or the substantial equivalent of those
limitations. (See Oilmatic Br., at 16-31.) Thus, Oilmatic

contends that RTI cannot establish that its system infringes claim 1 of the '511 patent.  See Laitram Corp., 939 F.2d at 1535.

### a.   Claim 1(e)

Limitation (e) of claim 1 states, "control means for selectively operating said filtering, waste[,] supply and fryer valve means and for selecting a pipe path between a predetermined pair of said stations".  (Dkt. entry no. 1, Ex. A, '511 patent, at col 11, lines 14-17.)  The parties previously agreed that this language is subject to a means-plus-function analysis, and thus, the Court construed it under Section 112, paragraph 6.  (Dkt. entry no. 51, 2-6-07 Mem. Op., at 27-31.)  The Court noted that the functions explicitly recited in limitation (e) of claim 1 are (1) selectively operating the filtering, waste, supply, and fryer valve means, and (2) selecting a pipe path between a predetermined pair of stations. (Id. at 28.)  The Court also referenced portions of the specification pertaining to these recited functions.  (Id. at 28-29.)  In light of the specification, the Court determined that "manual as well as electrical control systems are encompassed by limitation (e) of claim 1."  (Id. at 30.)  The Court then concluded that "the corresponding structures disclosed in the specification that are necessary for selectively operating the various valve means and selecting a pipe path between stations are a manual system of push-pull knobs, or a partially or completely automated system

24

comprised of microprocessor controls.  See Linear Tech. Corp., 379 F.3d at 1322 (noting that Section 112, paragraph 6 permits a claim element to embrace alternative described structures for performing a claimed function)."  (Id.)[5]

Oilmatic notes that its system does not employ any microprocessor controls.  (Oilmatic Br., at 17.)  Further, Oilmatic argues, inter alia, that (1) its system does not use a manual system of push-pull knobs, and (2) the three-position switch on the dipstick, which the operator moves between "fill", "off", and "drain", and the pump start button that completes the desired circuit when compressed are substantially different than the '511 patent's system of push-pull knobs, which requires the operator to push or pull a knob that is mechanically linked to a valve.  (id. at 18-20.)  Thus, Oilmatic asserts that its "'structure' is entirely different from a manual system of push-pull knobs as are the acts involved in selecting a pipe path",

---

[5] In reaching this conclusion, we noted that a patent may include some level of human intervention as long as a human is not included in the patent as a claimed structure, but instead merely operates a claimed structure.  (Id.)  See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1300 (Fed. Cir. 2005) (stating that a human being cannot constitute a "means", and noting that a court must determine what structure the human being operates to perform the recited function).  We stated, "construing limitation (e) of claim 1 as encompassing manual as well as electronic systems for performing the recited functions does not infer that human intervention is claimed as part of the corresponding structure."  (Dkt. entry no. 51, 2-6-07 Mem. Op., at 31.)

and no reasonable juror could conclude that the difference is insubstantial.  (Id. at 20.)  Moreover, it asserts that because its push-button switch technology was developed before the '511 patent issued, its system does not infringe claim 1(e) under the doctrine of equivalents.  (Id. at 23.)

RTI, in contrast, argues that the Oilmatic system includes two types of "control means" that satisfy limitation (e) of claim 1.  (RTI Br., at 25.)  First, the Oilmatic system includes a dipstick assembly, which consists of electromechanical switches used for selecting a pipe path between the supply tank and fryer or the fryer and waste tank.  (Id. at 25-26.)  RTI asserts that these control means are "a known interchangeable alternative that persons of ordinary skill in the art as of 1993 recognized as insubstantially different from the disclosed structures" in the '511 patent.  (Id. at 26.)  Specifically, RTI contends that "skilled art workers would have recognized that manual and microprocessor operated controls represented two end-member examples along a continuum of alternatives . . . [and] such end-member structures to operating a valve have equivalents, including but not limited to electronic controls as utilized in the Oilmatic system."  (Id. at 27-28.)  Further, RTI argues that Oilmatic's system includes a manual system of push-pull knobs associated with the fryer and filtration units, which are virtually identical to the manual system of push-pull knobs

disclosed in the '511 patent's specification.   (<u>Id.</u> at 26, 30.)
RTI asserts that "[b]y omitting any discussion of these
components, [Oilmatic] has failed to meet its burden of
establishing that its system does not include control means".
(<u>Id.</u> at 26-27 (internal quotations omitted).)

     "Once a means-plus-function claim is construed, literal
infringement is analyzed by determining whether 'the accused
device employs structure identical or equivalent to the structure
disclosed in the patent and . . . the accused device performs the
identical function specified in the claim.'"   <u>NMT Med., Inc. v.
Cardia, Inc.</u>, No. 06-1645, 2007 U.S. App. LEXIS 13466, at *9
(Fed. Cir. June 6, 2007) (citations omitted); <u>see</u> <u>Applied Med.
Res. Corp. v. U.S. Surgical Corp.</u>, 448 F.3d 1324, 1333 (Fed. Cir.
2006) (stating same); <u>Versa Corp.</u>, 66 Fed.Appx. at 856 ("Literal
infringement of a [Section 112, paragraph 6] claim requires that
the relevant structure in the accused device perform the
identical function recited in the claim and be identical or
equivalent to the corresponding structure in the specification.")
"Equivalent" in the context of Section 112, paragraph 6, "results
from an insubstantial change that adds nothing of significance to
the structure, material, or acts disclosed in the patent
specification."   <u>Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.</u>,
938 F.2d 1039, 1043 (Fed. Cir. 1993).   Accordingly, if the Court
determines that the accused device does perform the claimed

function, then the issue becomes whether the differences between the structure in the accused device and the structure in the claimed device are insubstantial.  <u>NMT Med., Inc.</u>, 2007 U.S. App. LEXIS 13466, at *12; <u>see</u> <u>Ghaly v. Hasbro, Inc.</u>, 112 Fed.Appx. 7, 12 (Fed. Cir. 2004) ("If the accused devise does perform a function identical to that identified in the means-plus-function clause, it 'literally infringes a claim element . . . only if it is insubstantially different from the corresponding structure in the patent specification.'" (omission in original)); <u>Valmont Indus., Inc.</u>, 938 F.2d at 1043 (explaining that determining equivalence under Section 112, paragraph 6 involves simply comparing the structure in the accused device with the structure in the specification).

Summary judgment is not appropriate if there are both differences and similarities between the accused device and claimed device, and thus, "[t]here remains a triable issue of fact on the question of substantial difference."  <u>NMT Med., Inc.</u>, 2007 U.S. App. LEXIS 13466, at *13-*14; <u>but see</u> <u>Lockheed Martin Corp. v. Space Sys./Loral, Inc.</u>, 324 F.3d 1308, 1320-21 (Fed. Cir. 2003) (affirming grant of summary judgment of noninfringement on undisputed facts).

The Oilmatic system is not completely or partially automated and does not involve any computer operations.  Thus, it does not include any microprocessor controls or the substantial equivalent

of such controls.  (See Oilmatic Br., at 17.)  Instead, the
Oilmatic system uses a three-position switch and push start
button located on the dipstick to perform the identical function
described in limitation (e) of selecting a pipe path.  (Id. at
18.)  (See dkt. entry no. 51, 2-6-07 Mem. Op., at 28 (stating
functions for the "control means" of limitation (e) of claim 1).)
Further, for purposes of simplifying this motion, Oilmatic does
not dispute RTI's contention that the Oilmatic switch and push
start button selectively operate the various valves claimed in
limitations (e).  (Id. at 19 n.2.)[6]  Accordingly, for purposes of
addressing Oilmatic's motion, the Court will assume that
Oilmatic's switch and pump start button on the dipstick perform
both of the functions claimed in limitation (e), and will simply
address whether the differences between Oilmatic's structure and
the manual system of push-pull knobs described in the '511
patent's specification are insubstantial.  See NMT Med., Inc.,
2007 U.S. App. LEXIS 13466, at *12.

The operator of the Oilmatic system may move the switch
between "fill", "off", and "drain".  (Oilmatic Br., at 19.)  The
operator may then depress the pump start button, which energizes
the fresh oil pump (fill pump) or waste oil pump (drain pump)
depending upon the position of the switch.  (Id.)  The Court, in

_____

[6] Also for purposes of this motion, Oilmatic does not
challenge RTI's contention that Oilmatic's fresh oil pump and
waste pump are valves.  (Id.)

its 2-6-07 Memorandum Opinion, noted that the '511 patent's
specification contains the following statements, which describe
the structures corresponding to the functions claimed in
limitation (e) of claim 1:

> Selecting the pipe path selected for an appropriate
> cycle can be accomplished either by manually opening
> and closing appropriate valves as is discussed below,
> or electronically through a controller such as a panel
> controller that provides signals to the appropriate
> valves when a particular cycle is selected.
> Microprocessor controls for controlling the opening and
> closing solenoid operated valves are well known.  (dkt.
> entry no. 1, Ex. A, '511 patent, at col. 6, lines 46-
> 53.)

> The front panel 82 mounts a plurality of push-pull
> knobs. . . .  Each knob is connected to a valve as
> discussed below.  By pulling a knob, an associated
> valve is manually opened.  Pushing the knob into
> contact with the front of the panel closes its
> associated valve.  (Id. at col. 8, lines 10-16.)

> The operating rods are mounted for sliding movement
> toward and away from the front wall of housing 62 and
> the front wall of panel 82.  FIGS. 15 and 16 depict a
> linkage structure suitable for the operating of valves
> 138-152.  For example, operating rod 122a is pivotally
> connected to lever arm 138a of valve 138, thus
> operatively connecting knob 122 to valve 138.  By
> pushing or pulling knob 122 between the travel limits
> imposed by notches 123 on rod 122a (or alternatively
> protuberances on the rod) in cooperation with the front
> panel 82, the lever arm 138a of valve 138 can be moved,
> thus opening or closing valve 138 as desired.  Each of
> the other valves can be operated manually in a similar
> manner.  (Id. at col. 8, lines 43-56.)

> To cause the oil to pass through filter a number of
> times, knobs 126 and 132 are pulled, opening both
> filter entrance and exit valves 142 and 148.  (Id. at
> col. 9, lines 64-67.)

> In the case of pumping direct from the fryer, the
> operator first opens valves 144 and 150 by pulling

> knobs 128 and 134. . . .  (<u>Id.</u> at col. 10, lines 9-11.)
> Knob 124 is pulled, opening waste tank exit valve 140,
> allowing the used oil to be pumped through attachment
> 111 into the waste disposal line.  (<u>Id.</u> at col. 10,
> lines 21-23.)

In light of these statements in the specification, the Court

finds that the differences between the system of push-pull knobs

described in the '511 patent's specification and Oilmatic's

switch and push start button are substantial.  <u>See</u> <u>NMT Med.,</u>

<u>Inc.</u>, 2007 U.S. App. LEXIS 13466, at *12; <u>Ghaly</u>, 112 Fed.Appx. at

12; <u>Valmont Indus., Inc.</u>, 938 F.2d at 1043.

The manual system of push-pull knobs set forth in the '511

patent requires the operator to (1) pull a knob connected to an

operating rod capable of sliding back and forth in order to open

the associated valve, or (2) push a knob connected to an

operating rod capable of sliding back and forth in order to close

the associated valve.  In contrast, the Oilmatic system requires

the operator to (1) turn the switch located on the dipstick to

"fill" and then depress the push start button, which energizes

the fresh oil pump, or (2) turn the switch located on the

dipstick to "drain" and then depress the push start button, which

energizes the waste oil pump.  (Oilmatic Br., at 10-11.)  Thus,

Oilmatic's switch and push start button are significantly

different than the system of push-pull knobs described in the

'511 patent's specification.  <u>See</u> <u>Valmont Indus., Inc.</u>, 938 F.2d

at 1043.  Specifically, these devices perform the applicable

31

functions in an entirely different way and their results, i.e. opening a valve versus energizing a pump, are also entirely different.  See Ishida Co., Ltd. v. Taylor, 221 F.3d 1310, 1317 (Fed. Cir. 2000) ("The insubstantial difference analysis requires a determination of whether the way the accused structure performs the claimed function, and the result of that performance, are substantially different from the way the claimed function is performed by the corresponding structure." (internal quotations omitted)).  The "means" in Oilmatic's system are not structurally equivalent to the "means" described in the '511 patent's specification with respect to selecting a pipe path and operating the specified valve means.  See Laitram Corp., 939 F.2d at 1556.  Therefore, the Court concludes that a reasonable juror would find that the differences between these two structures are substantial, and thus, the Oilmatic system does not literally infringe claim 1(e) of the '511 patent.

The Court also concludes that the Oilmatic system does not infringe claim 1(e) under the doctrine of equivalents.  To demonstrate infringement under the doctrine of equivalents, the plaintiff must show "that the accused device performs substantially the same function as the patented device in substantially the same way to achieve substantially the same result."  Ghaly, 112 Fed.Appx. at 12.  In the means-plus-function context, the proper inquiry under the doctrine of equivalents is

32

whether there is an insubstantial difference between the structure corresponding to the function stated in the claim limitation and any after-invented technology found in the accused device.  Id.  Thus, the doctrine of equivalents can only "come into play to determine infringement of a means-plus-function claim element if the accused device features technology that has arisen since the time of patent issuance."  Ishida Co., Ltd., 221 F.3d at 1317.

The '511 patent's specification mentions a switch "appropriately connected to a source of electrical power [which] serves to energize or de-energize pump 74."  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 8, lines 16-18.)  Accordingly, a switch that energizes a pump, as is used in Oilmatic's system, was technology in existence at the time the '511 patent issued in 1993.  (See id. at 1)  Therefore, RTI cannot show that Oilmatic is infringing limitation (e) of claim 1 under the doctrine of equivalents because the "means" Oilmatic uses to perform the functions stated in limitation (e) were known in the art before the '511 patent issued.  See Ishida Co., Ltd., 221 F.3d at 1317.[7]

---

[7] The Court rejects RTI's argument that "skilled art workers would have recognized that manual and microprocessor operated controls represent two end-member examples along a continuum of alternatives . . . [and] such end-member structures to operating a valve have equivalents, including but not limited to electronic controls as utilized in the Oilmatic system."  (RTI Br., at 27-28.)  A means-plus-function claim limitation cannot embrace a "continuum" of corresponding structures, but instead, the

### b.   Claim 1(d)(iii)

Limitation (d)(iii) of claim 1 states, "means for metering oil" to the fryer in predetermined amounts.  (Id. at col. 11, lines 12-13.)  The parties previously agreed that this language is subject to a means-plus-function analysis.  (Dkt. entry no. 51, 2-6-07 Mem. Op., at 24.)  In construing this language, the Court noted that (1) the function explicitly recited in limitation (d)(iii) of claim 1 is metering oil to the fryer in predetermined amounts, and (2) "metering oil" entails supplying oil in a regulated or measured amount.  (Id. at 25.)  See Merriam-Webster Dictionary (2005) (defining "metering").  Accordingly, the Court determined that:

> the metering of oil to the fryer does not begin when
> (1) oil is placed into the system, (2) a valve is
> opened releasing oil into one of the pipe lines, (3)

─────────────────────

specification and prosecution history must clearly link or associate a structure with the function stated in the limitation. See Omega Eng'g, Inc., 334 F.3d at 1322; Linear Tech. Corp., 379 F.3d at 1322 (stating that Section 112, paragraph 6 reads a claim element as embracing "distinct and alternative described structures for performing the claimed function").  This Court construed the "control means" language in limitation (e) as encompassing only two distinct and alternative structures, a manual system of push-pull knobs or partially or fully automated microprocessor controls.  (See dkt. entry no. 51, 2-6-07 Mem. Op., at 30.)  The Court also rejects RTI's contention that Oilmatic's system has a manual system of push-pull knobs associated with its fryer and filtration units, which satisfy limitation (e).  (RTI Br., at 26-27, 30.)  Although the Oilmatic system is always used in conjunction with a filter and a fryer unit, the controls that operate such units are not part of the Oilmatic system.  (Id. at 2.)

the pump is activated, or (4) oil travels along a
preselected pipe path.  Instead, the metering begins
only when oil is directly supplied or placed into the
fryer vat.

(Id.)  The Court then concluded that the structure necessary to

supply oil to the fryer in measured or regulated amounts is a

manually or electronically operated trigger valve having a

nozzle, which opens when the valve is squeezed (i.e., a

squeezable trigger valve with a nozzle).  (Id. at 27.)

Oilmatic argues that its system does not perform the

function recited in limitation d(iii) of claim 1 of metering oil

to the fryer in predetermined amounts, as that language was

construed by this Court.  (Oilmatic Br., at 25-26.)  Moreover,

Oilmatic's fresh oil pump cannot be considered a "trigger valve

with nozzle", which is the structure that this Court previously

determined corresponds to the stated function of supplying oil

directly to the vat.  (Id. at 27.)  Thus, Oilmatic contends that

"based on the Court's Markman decision, (1) Oilmatic's fresh oil

pump does not perform the identical function of limitation d(iii)

and (2) Oilmatic's pump may not constitute the structure called

for in limitation d(iii)."  (Id. (emphasis in original).)

Oilmatic further contends (1) that no reasonable juror could

conclude that its combination of switches for activating pumps is

the structural equivalent of a trigger valve with nozzle, and (2)

because a pump activated by a switch is disclosed in the '511

patent, RTI cannot show that Oilmatic's system infringes

35

limitation d(iii) under the doctrine of equivalents.  (Id. at 27-31.)

RTI, in contrast, argues that Oilmatic's system permits the operator to perform the function recited in limitation d(iii) of regulating the amount of oil delivered to the fryer by squeezing the push start button to start the flow of oil and releasing the button to stop the flow of oil.  (RTI Br., at 17-19.)  Further, RTI argues that Oilmatic's dipstick assembly and fresh oil pump constitute an electronically operated trigger valve with nozzle. (Id. at 20-24.)  Specifically, RTI states, inter alia, that (1) "[i]t can't be disputed that Oilmatic's dipstick assembly has a nozzle and utilizes an electronically operated valve to meter the flow of oil to the fryer", and (2) the trigger mechanism may be anything that opens a valve when engaged.  (Id. at 20, 22.) Last, RTI asserts that "[t]he Oilmatic dipstick assembly, with an electrical circuit to activate a valve (pump) located upstream, is no different, and would be considered an insubstantial difference, if any, from the disclosed electronically controlled trigger valve."  (Id. at 23.)

To fill the fryer with oil, the operator of an Oilmatic system turns the switch located on the dipstick to "fill" and depresses the push start button, activating the fresh oil pump and causing oil to flow through the dipstick nozzle.  (Oilmatic Br., at 10-11.)  The operator can cease filling the fryer with oil at

any time by simply releasing the push-start button.  Accordingly,
the Court finds that Oilmatic's system performs the identical
function specified in claim 1(d)(iii), namely, supplying oil to
the fryer in regulated or measured amounts.  See NMT Med., Inc.,
2007 U.S. App. LEXIS 13466, at *9.  The Court notes that the
metering does not begin in the Oilmatic system when the fresh oil
pump is activated, but instead, begins when the oil flows from
the dipstick nozzle into the fryer vat.  (See dkt. entry no. 51,
2-6-07 Mem. Op., at 25 (explaining when "metering" of oil begins
in context of claim 1(d)(iii) of the '511 patent).)  Oilmatic
argues that because this Court concluded that the metering of oil
does not begin when a pump is activated, "the fresh oil pump of
the Oilmatic system does not perform the identical function of
'metering oil to said fryer in predetermined amounts".  (Oilmatic
Br., at 26.)  However, this argument improperly conflates the
distinct questions of whether the accused device (1) employs
structure identical or equivalent to the structure disclosed in
the patent, and (2) performs the identical function specified in
the claim.  See NMT Med., Inc., 2007 U.S. App. LEXIS 13466, at
*9.  Both questions must be answered in the affirmative for the
Court to find that the accused device infringes the particular
claim limitation at issue.

Although the Court finds that the Oilmatic system performs
the identical function recited in limitation d(iii) of the '511

37

patent, we, nevertheless, hold that Oilmatic's dipstick assembly
and fresh oil pump do not constitute and are not equivalent to
the structure corresponding to such function in the '511 patent,
a squeezable trigger valve with nozzle.  (See RTI Br., at 20-24
(arguing that Oilmatic's dipstick assembly and fresh oil pump
constitute a trigger valve with nozzle).)  The Court, in its 2-6-
07 Memorandum Opinion, noted that the '511 patent's specification
contains several statements that describe the structure
corresponding to the function claimed in limitation (d)(iii) as a
"squeezable" valve.  (See dkt. entry no. 51, 2-6-07 Mem. Op. at
25-26 (noting that the specification references, inter alia, a
"squeezable nozzle valve" and a "squeezable trigger valve 156
with a nozzle").)  The Oilmatic system does not employ a
squeezable valve to perform any function, including supplying oil
to the fryer in measured amounts.  The fresh oil pump, which
Oilmatic concedes is a valve for purposes of this motion only, is
not squeezed during any step in the process of filling the fryer
with oil.  Instead, the pump is "energized" or "turned on" when
the operator presses the push start button creating "oil pressure
in the supply line which, when it reaches a threshold level, will
overcome the spring-loaded check valve at the end of the dipstick
supply nozzle such that fresh oil will pour from the supply
nozzle into the fryer."  (Oilmatic Br., at 10-11.)  Moreover, the
pump is "a positive displacement gear pump with a structure of an

input shaft which is rotated in a single direction to increase fluid pressure between the inlet and outlet by conversion of electrical energy to mechanical energy." (Id. at 29.) Thus, input shaft rotation creates the necessary pressure to move oil in the Oilmatic system, not squeezing.

The dipstick assembly also is not an equivalent structure. Even if the Court were to determine that turning the switch is equivalent to "squeezing", neither the switch, nor the push start button, whether analyzed separately or jointly, are equivalent to a valve. This Court explained in its 2-6-07 Memorandum Opinion that (1) limitation (d)(iii) does not cover any valve, nozzle, or switch that performs the recited function because the specification only discloses a squeezable trigger valve having a nozzle, and (2) the specification does not limit such trigger valve to a manually operated valve, but instead states that all manually operated valves disclosed therein may be completely or partially automated using microprocessor based controls. (Dkt. entry no. 51, 2-6-07 Mem. Op., at 27; see dkt. entry no. 1, Ex. A, '511 patent, at col 10, lines 46-49.) Further, the Court construed the term "valve" as encompassing "any device that starts, stops, regulates, or controls the movement of liquid in a particular direction or down a particular pathway." (Dkt. entry no. 51, 2-6-07 Mem. Op., at 23.) While Oilmatic's switch and push start button located on the dipstick enable the operator to

39

both choose a pipe path between the supply line and waste line, and supply oil to the fryer in predetermined amounts, they do not start, stop, or regulate the movement of the oil down either pipe path.  It is the filter pump and waste pump that act as "valves" and cause the oil to move, as Oilmatic concedes for purposes of this motion.  Moreover, the switch and push start button do not employ any trigger and are not squeezed during the filling or draining of the fryer vat.  Therefore, there are substantial differences between Oilmatic's dipstick assembly and fresh oil pump, and the squeezable trigger valve with nozzle that corresponds to limitation d(iii) of claim 1 of the '511 patent. See <u>Valmont Indus., Inc.</u>, 938 F.2d at 1043.  Thus, the Court finds that the Oilmatic system does not literally infringe claim 1(d)(iii) of the '511 patent because the accused devices in Oilmatic's system are not structurally equivalent to the "means" described in the '511 patent's specification.  <u>Laitram Corp.</u>, 939 F.2d at 1556.

The Court also finds that the Oilmatic system does not infringe claim 1(d)(iii) under the doctrine of equivalents.  To demonstrate infringement under the doctrine of equivalents, the plaintiff must show "that the accused device performs substantially the same function as the patented device in substantially the same way to achieve substantially the same result." <u>Ghaly</u>, 112 Fed.Appx. at 12.  In the means-plus-function context, the proper inquiry under the doctrine of equivalents is

whether there is an insubstantial difference between the structure corresponding to the function stated in the claim limitation and any after-invented technology found in the accused device.  Id.  As noted above, the '511 patent's specification mentions a switch "appropriately connected to a source of electrical power [which] serves to energize or de-energize pump 74."  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 8, lines 16-18.)  Accordingly, because using a switch to activate a pump in this context was known in the art before the '511 patent issued in 1993, RTI cannot show that Oilmatic is infringing limitation (d)(iii) of claim 1 under the doctrine of equivalents.

### c.  Conclusion as to Claim 1

The Oilmatic system does not meet limitations (e) and (d)(iii) of claim 1.  Thus, Oilmatic is entitled to summary judgment of noninfringement with respect to claim 1 of the '511 patent.  See Laitram Corp., 939 F.2d at 1535 (noting that "the failure to meet a single limitation is sufficient to negate infringement of the claim").

### 2.  Claim 8(e)

Limitation (e) of claim 8 claims, "piping network interconnecting said first and second containers, said filter unit and said first and second couplings".  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 12, lines 5-7.)  We previously determined, based on the parties' Markman submissions, that there

41

was no dispute with respect to limitation (e) of claim 8, and
thus, we did not construe that limitation, but noted that it
should be read in accordance with the ordinary and plain meaning
of its terms.  (Dkt. entry no. 51, 2-6-07 Mem. Op., at 40.)

Oilmatic now argues that the Court should construe the term
"interconnecting" as meaning "to connect mutually or with one
another."  (Oilmatic Br., at 31-32.)  Accordingly, Oilmatic
asserts that limitation (e) of claim 8 requires a piping network
that connects the first and second containers, filter unit, and
first and second couplings to one another.  (Id. at 32.)
Oilmatic notes that its system has (1) a fill pipe line that
leads from the supply oil coupling through the fresh oil tank and
fresh oil pump to the fresh oil dipstick nozzle, but the fill
pipe line is not connected to the waste oil tank or waste oil
coupling, and (2) a drain pipe line that leads from the waste oil
dipstick nozzle through the waste oil pump and waste oil tank to
the waste oil coupling, but the drain pipe line is not connected
to the fresh oil tank or supply oil coupling.  (Id. at 34.)
Therefore, Oilmatic asserts "it is undisputed that there is no
piping network 'interconnecting' the separate paths or the five
identified components which are required to be interconnected in
the claim."  (Id. at 35.)  Thus, Oilmatic contends that summary
judgment of noninfringement is appropriate on claim 8 because the
Oilmatic system does not meet limitation (e) of claim 8 either
literally or under the doctrine of equivalents.  (Id. at 37.)

42

But RTI argues that the word "comprising" in the preamble to claim 8 indicates that the claim permits other components to be interconnected by the piping network beyond those expressly listed in limitation (e). (RTI Br., at 8.) Further, RTI argues that "it is beyond dispute that Oilmatic's system includes a 'piping network interconnecting' the specified components." (Id.) RTI asserts, inter alia, that (1) the Court should construe "piping network interconnecting" as describing a system of pipes that allow fluid to flow from one component of the system to another, and (2) a person of ordinary skill in the art would not understand this language as limiting claim 8 to systems with fixed connections between the interconnected components, or systems where fluid can be transferred from one component to another without passing through a third component (i.e., limited to direct connections). (Id.) RTI argues, in the alternative, that even if limitation (e) is construed as requiring direct, hard-plumbed connections between the components, the Oilmatic system would still infringe limitation (e) under the doctrine of equivalents. (Id. at 14.) Specifically, RTI contends that "[i]t is beyond dispute that the piping network in Oilmatic's system contains the structure needed to perform the operating cycles described in the patent, that it does so by providing pipe paths, and in this way achieves the same result as the piping network described in the patent". (Id. at 15.)

43

The term "network" is commonly used and has a widely accepted meaning.  See Phillips, 415 F.3d at 1314 (explaining that the ordinary meaning of claim language will often be readily apparent to a lay judge, and thus, claim construction will involve simply applying the widely accepted meanings of commonly understood words).  Webster's Ninth New Collegiate Dictionary defines a "network" as, inter alia, (1) "a fabric or structure of cords or wires that cross at regular intervals and are knotted or secured at the crossings", (2) "a system of lines or channels resembling a network", and (3) "an interconnected or interrelated chain, group, or system".  Webster's Ninth New Collegiate Dictionary 794 (1991); see Phillips, 415 F.3d at 1314 (noting that general purpose dictionaries may assist courts in determining widely accepted meanings of commonly used words).  Further, the term "interconnect" is defined as, inter alia, "to connect with one another", while "interconnected" is defined as, inter alia, "having internal connections between the parts or elements".  Webster's Ninth New Collegiate Dictionary 630 (1991).  The specification states that the term "piping" generally defines "the network of pipe lines carrying the cooking oil and which form a component part of the system and apparatus described herein."  (Dkt. entry no. 1, Ex. A, '511 patent, at col. 3, lines 13-16.)  The specification also contains the following reference to the "piping network":

44

> The stations are interconnected by piping . . . capable
> of carrying the required flow of cooking oil between
> selected stations for the various purposes as described
> below. (Id. at col. 4, lines 46-49.)

After reviewing the plain language of limitation (e) of claim 8
and the relevant portions of the specification, this Court finds
that this limitation claims a system of pipe line channels
capable of carrying cooking oil, which connect the first and
second containers, filter unit, and first and second couplings to
one another.

Oilmatic concedes that its system contains first and second
containers and first and second couplings. (See Oilmatic Br., at
34.) Additionally, the Court acknowledges that the Oilmatic
system is always used with a filter. (RTI Br., at 2.)
Nevertheless, the Oilmatic system lacks a "piping network
interconnecting" these five components. The Oilmatic system has
a fill pipe line that connects the supply oil coupling, the fresh
oil tank, the fresh oil pump, and the fresh oil dipstick nozzle
to one another. (Oilmatic Br., at 34.) It also has a separate
drain pipe line that connects the waste oil dipstick nozzle, the
waste oil pump, the waste oil tank, and the waste oil coupling to
one another. (Id.) However, the components connected by the
fill pipe line, which include the first coupling and first
container, are not connected in any way to the components of the
drain pipe line, which include the second container and second
coupling. Moreover, any filter that is used in connection with

the Oilmatic system is an entirely separate apparatus and would not be connected by pipe line to the components of Oilmatic's system.  Therefore, the Court concludes that the Oilmatic system does not satisfy limitation (e) of claim 8 because its first and second containers, first and second couplings, and filter unit are not connected to one another by pipe line channels.  See Laitram Corp., 939 F.2d at 1535 (explaining that the second step in the infringement analysis is comparing the allegedly infringing product to each claim at issue to determine whether the product contains every limitation contained in such claim or the substantial equivalent of any limitation not literally present).

The Court further concludes that the Oilmatic system does not contain the substantial equivalent of limitation (e), and thus, does not infringe it under the doctrine of equivalents.  Under the well-established test first set forth in Graver Tank & Mfg. Co., Inc. v. Linde Air Prod. Co., an accused device infringes a patent under the doctrine of equivalents if such device performs substantially the same function, in substantially the same way, and obtains substantially the same result.  339 U.S. 605, 607-09 (1950).  "[E]quivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case."  Id. at 609.  However, not all claim limitations are entitled to the same scope of

46

equivalents.  <u>Moore U.S.A., Inc. v. Standard Register Co.</u>, 229
F.3d 1091, 1106 (Fed. Cir. 2000) (explaining that many
limitations warrant few or no equivalents).  Limitation (e) of
claim 8 is one such limitation warranting few or no equivalents
because there are no insubstantial or trivial changes that could
be made to this limitation; the specified components are either
connected or not connected to one another by a piping network.
See <u>L.B. Plastics, Inc. v. Amermax Home Prod., Inc.</u>, No. 06-1465,
2007 U.S. App. LEXIS 21821, at *12 (Fed. Cir. Sept. 12, 2007)
("The doctrine of equivalents allows the patentee to claim those
insubstantial alterations that were not captured in drafting the
original patent claim but which could be created through trivial
changes.").

The Court thus concludes that the Oilmatic system, in which
the components of the fill pipe line, including the first
coupling and first container, are in no way connected by pipe
line channels to the drain line, including the second coupling
and second container, is substantially different from limitation
(e) of claim 8.  A system that requires certain specified
components to be "interconnected" cannot be considered
substantially the same as a system the does not directly connect
such components.  See <u>id.</u> (stating, "it would defy logic to
conclude that a minority – the very antithesis of a majority –
could be insubstantially different from a claim limitation

requiring a majority, and no reasonable juror could find otherwise"). Accordingly, the Court finds that Oilmatic is entitled to summary judgment of noninfringement with respect to claim 8. See Laitram Corp., 939 F.2d at 1535 (noting that "the failure to meet a single limitation is sufficient to negate infringement of the claim").

### 3.   Claims 2 through 5

Claims 2 through 5 depend upon claim 1. Accordingly, because the Court has determined that the Oilmatic system does not infringe claim 1 literally or under the doctrine of equivalents, it follows that the Oilmatic system also does not infringe claims 2 through 5.

### 4.   Claim 11

Claim 11 depends upon claim 8. Accordingly, because the Court has determined that the Oilmatic system does not infringe claim 8 literally or under the doctrine of equivalents, it follows that the Oilmatic system also does not infringe claim 11. Also, we find that claim 11 should be construed consistent with our construction of claim 8.

### B.   RTI's Cross Motions

In light of the Court's holding that the Oilmatic system does not infringe claims 1 or 8, the only independent claims, of the '511 patent, the Court will deny RTI's cross motion for summary judgment of infringement of claim 8, and will not address

48

RTI's cross motion for summary judgment of nonanticipation at this time.  (See dkt. entry nos. 85-2, 86-2, 95, 96.)[8]

### III. Relief For Jersey Shore and Klee's

Jersey Shore and Klee's, and Oilmatic, are represented by the same counsel.  (See generally docket.)  However, the motion for summary judgment was made on behalf of Oilmatic only.  (See dkt. entry no. 64, Notice of Motion.)  But it appears that Jersey Shore and Klee's may be entitled to the same relief awarded to Oilmatic.  Thus, the Court will order the parties to show cause why judgment should not be entered in favor of Jersey Shore and Klee's, and against RTI, for the same reasons that judgment has been entered in favor of Oilmatic.

### CONCLUSION

The Court, for the reasons stated supra, will (1) grant Oilmatic's motion, (2) deny RTI's cross motion for summary judgment of infringement of claim 8 of the '511 patent, (3) deny RTI's cross motion for summary judgment of nonanticipation as moot, (4) enter judgment in favor of Oilmatic, and against RTI,

---

[8]   The Court notes that RTI bases its cross motion for summary judgment of infringement of claim 8 on limitations (e) and (f) of that claim.  (See dkt. entry no. 86-2.)  However, the infringement analysis requires that "every claim limitation or its equivalent be found in the accused device".  See Plant Bingo, LLC v. Gametech Int'l, Inc., 472 F.3d 1338, 1341 (Fed. Cir. 2006).  Thus, because the Court has already determined that the Oilmatic system does not satisfy limitation 8(e), it is unnecessary for the Court to address limitation 8(f) at this juncture.

on Oilmatic's claim for noninfringement and RTI's counterclaim for infringement, and (5) order the parties to show cause why judgment should not be entered in favor of Jersey Shore and Klee's, and against RTI, as to (a) their counterclaims against RTI for noninfringement, and (b) RTI's claims against them for infringement.  The Court will issue an appropriate order, judgment, and order to show cause.

   s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**Dated:** November 15, 2007